ISIDRO GODOY, ON BEHALF OF HIMSELF AND MEMBERS OF THE FILIPINO BUS ASSOCIATION AND ALL OTHERS SIMILARLY SITUATED *v.* COUNTY OF HAWAII.

No. 4059.

JUNE 16, 1960.

TSUKIYAMA, C. J., MARUMOTO, CASSIDY, WIRTZ AND LEWIS, JJ.

OPINION OF THE COURT BY CASSIDY, J.

Ordinance No. 59 enacted by the Board of Supervisors of the County of Hawaii in 1948 created a committee, commonly called the "Bus Control Committee," to control and regulate common carriers of passengers in the City of Hilo. The ordinance gave the committee broad powers,

including the authority to regulate rates, routes, standards of safety, and the insurance requirements of operators within the purview of the ordinance. All such operators were required to obtain from the committee and maintain a certificate of public convenience and necessity. The committee had the power, in its discretion, to limit the extent of the privilege to be exercised under a certificate and to attach terms and conditions to the exercise of rights granted by one. No authority was expressly granted the committee by the ordinance to charge fees of any kind or to impose other charges against carriers for the use of facilities under the committee's control.

Commencing April 15, 1949, the committee required all buses subject to its control to be operated from a designated terminal located in the city's Mooheau Park. At that time there were some 78 buses, of the sampan type unique to Hilo, in operation as certified carriers. The terminal area was only large enough to provide for approximately one half that number of parking stalls. As a necessary expedient the Bus Control Committee adopted a regulation which permitted each bus to be operated from the terminal on alternate days only. The determination of the days on which a bus could be operated depended on the number assigned to its certificate of convenience. Buses covered by certificates bearing odd numbers had to be operated on the odd days of the month and those with even numbers on the even days of the month.

By Ordinance No. 79, adopted on August 19, 1949, the board of supervisors officially set aside the terminal area in Mooheau Park for buses regulated by the Bus Control Committee. Section 3 of the ordinance provided that: "The Bus Control Committee shall collect from the owner of each bus parking in said area the sum of Eight Dollars ($8.00) per month." Monies collected by the committee were to be set up in a separate fund for use in improving

and maintaining bus control. The ordinance vested the committee with power to make such rules and regulations for the parking of the buses as it deemed necessary for carrying out the purpose of the ordinance. The ordinance was adopted on the basis of a report made to the board of supervisors by an investigator of the Territorial public utilities commission. The rate of $8 a month as the rental fee for each bus operated by authority of the committee was fixed and recommended by the investigator and adopted by the board to provide the amount necessary to meet the estimated operating budget for the terminal based on 75 vehicles operating out of it.

Acting under the requirement of Ordinance No. 79, the Bus Control Committee adopted a regulation imposing a parking charge of $8 a month for each bus covered by a certificate of convenience. The regulation permitting the owner to operate a bus only on the alternate days set by the number of its certificate was continued in force.

On March 28, 1951, the committee adopted a regulation inaugurating a new optional method of operating out of the terminal. The arrangement was called the "Mabuni Plan" after a member of the Bus Control Committee who was also an active bus operator. Under the new plan, any certified operator who owned two or more buses could, if he desired, withdraw a bus from service and transfer its certificate number and privilege of operating to a bus retained by him in service. The certificate for the retained bus would then bear one odd and one even number and the owner, instead of having to maintain and operate two buses, each of which could only be operated on alternate days, could then operate a single bus every day for the aggregate charge of $16 a month. The Mabuni Plan was put on a trial basis for three months commencing April 1, 1951. It was adopted on a permanent basis on July 18, 1951.

The plaintiff Isidro Godoy elected to come under the plan on May 1, 1951. He owned two buses, operating them under certificates Nos. 18 and 21. Under the old system he was entitled to operate bus No. 18 on even days and bus No. 21 on odd days. He retired bus 21 from service and transferred its number to the certificate of bus No. 18. He thereafter was entitled under the Mabuni Plan regulations to operate that bus every day of the month for the same payment of $16 a month previously required of him for the two buses.

Ordinance No. 154, effective May 1, 1955, amended Section 3 of Ordinance No. 79 by reducing the amount of the parking charge from $8 to $6.50 per month.

Approximately six months after the adoption of Ordinance No. 154, Isidro Godoy filed the complaint in this action to recover from the County of Hawaii one half of the total amount of the parking charges collected from him by the Bus Control Committee from and after May 1, 1951. The complaint is predicated on the theory that the Mabuni Plan was illegal for the averred reason that the committee did not have the authority to charge more per month for any one bus using the terminal than the parking fee prescribed by ordinance, that is, $8 a month before, and $6.50 a month after the amendment of Ordinance No. 79. Plaintiff, accordingly, claims he had been overcharged $8 a month from May 1, 1951 to May 1, 1955 and $6.50 a month thereafter. In addition to seeking recovery of the amount of the claimed excessive payments the complaint also prays for injunctive relief against a continuance of the claimed overcharging.

The action was instituted by plaintiff Isidro Godoy on behalf of himself and "Members of the Filipino Bus Association and All Others Similarly Situated." The complaint alleges there were 31 members of the Filipino Bus Association. After a jury-waived trial in which the above-

related basic facts and other facts were made to appear, the circuit judge rendered a decision in favor of the plaintiffs. The judgment entered in the case included a provision restraining the County of Hawaii from further assessing and collecting overcharges as claimed in the complaint. The decision and judgment left the matter as to which members of the bus association were entitled to recover, and the amounts of their respective recoveries, to later determination. The named plaintiff Isidro Godoy is sole appellee on this appeal.

Consistently with the theory of the complaint, appellee contends that the wording of Section 3 of Ordinance No. 79 is without ambiguity and that it so clearly and unequivocally sets and limits the fee that could be charged by the Bus Control Committee to "each bus" using the terminal to the amount specified by the section that no extrinsic considerations may be resorted to for the purpose of ascertaining whether a different meaning may be ascribed to it.

Appellant in effect contends that as the literal or strict construction of Section 3 urged by appellee will work palpable injustice and an unreasonable result, we may consider extrinsic aids to construe the section and that if it is considered in *pari materia* with Ordinance No. 59 and in light of its own legislative history, the contended limitation on the Bus Control Committee's authority to fix the charges must be rejected and its authority to adopt the Mabuni Plan sustained. The appellant also contends that Isidro Godoy and the other bus operators similarly situated with him are estopped from questioning the legality of the Mabuni Plan and the charges made thereunder.

The circuit court ruled against the defendant on both points. It held that the plain language of Section 3 of Ordinance No. 79 effectively limited the committee's power so that it could charge no more than $8 a month before

the amendment and no more than $6.50 after the amendment for any bus operating out of the terminal, irrespective of all other considerations, and further that the plaintiffs were not estopped from maintaining an action for recovery of overpayments. On the latter point the court's decision states:

"The Plaintiff, then, has been overcharged. He is entitled to recover, unless perhaps the evidence discloses that he agreed to the Mabuni Plan. The filing of this action and the evidence, however, indicate that Plaintiff is not estopped to avail himself of the ordinance. Judgment will issue as to him for any overpayments ascertained in accordance with this decision.

"As to other members of the Filipino Bus Association, only those few who, like the Plaintiff, withdrew from operation one or more of their buses pursuant to the adoption of the Mabuni Plan on July 18, 1951, are similarly entitled to recover for overpayments. I do not believe their failure, if any, to object strongly to the overcharge separates them from the purview of the ordinance."

A determination of whether Section 3 of Ordinance No. 79 is to be taken as a limitation on the committee's power to charge for the use of terminal facilities or as a mandate to the committee requiring it to make the specified charge as the minimum charge for such use necessarily entails first considering and ascertaining whether or not the Bus Control Committee had the implied power under the ordinance creating it or from the other provisions of Ordinance No. 79, to impose reasonable charges for use of facilities under its control. However, neither party has made any real attempt to grapple with that phase of the problem on construction. Under the circumstances we are disposed to determine this appeal, as we readily can, on the estoppel issue alone.

As we view the evidence there is no basis for concluding otherwise than that the plaintiff did agree to the Mabuni Plan and that he is estopped from maintaining that he was overcharged by the committee.

The intended purpose of the Mabuni Plan was to permit, as it obviously did, the owners of more than one bus to reduce their operating costs. The principal talking point apparently was on an annual saving for each bus inactivated of the $270 constituting the premium for liability insurance required to be carried for a bus in operation. License fees and other cost items could also be eliminated by letting one bus do the work it took two buses to do before the adoption of the plan.

Much of the plaintiff's testimony is not precise. Some of it taxes comprehension. For the most part this is due to the broken English of many of his answers. However, the only sustainable inference or conclusion from the evidence is that all of the bus operators affected, including plaintiff, were in favor of and urged the adoption of the Mabuni Plan. There is no evidence of any opposition to it. The only evidence of any dissatisfaction on the part of the bus operators pertained, not to the plan as such, but merely to the rate of the charge being made under it. We think the testimony of the plaintiff leaves no room for conjecture on whether or not he had agreed to the Mabuni Plan. The general tenor of his testimony supports the finding that he did so agree. No other conclusion could be warranted in view of plaintiff's answer to a question on direct examination, when, in reference to the Mabuni Plan, he said: "The Bus Control and all the bus drivers, we agreed with that plan."

The evidence further shows that for some months prior to the amendment of Ordinance No. 79 in 1955 the bus owners' association, of which plaintiff was a member, had been agitating for a reduction in the $8 parking fee, as a

result of which a written report on the subject was submitted by the Bus Control Committee to the board of supervisors on February 28, 1955. The report recommended "that the bus rental be reduced $1.50 to $6.50 per month instead of the prevailing $8.00 monthly," and concluded by stating: "This would mean that for a certificate calling for bus operation and parking on alternate days the charge would be $6.50 per month. Two certificates enabling a bus operator to park and operate his bus daily would mean that the parking fees would be $13.00 per month."

On April 9, 1955, the attorney for the bus operators' association wrote the board of supervisors requesting that the matter of reducing the stall rentals be considered at its next meeting and stating, in part: "The owners of the sam pan buses will be satisfied if your body will accept the recommendation of the bus control commission for a reduction of $1.50 per stall."

In summary, it appears from the evidence that the Mabuni Plan was adopted at the behest of the plaintiff and the bus owners generally. That not only did none of them ever subsequently protest the continuance of the plan, but they actually confirmed their approval and acceptance of it in 1955 by agreeing, through their attorney, to the proposal set out in the Bus Control Committee's report and recommendation to the board of supervisors which by clear implication called for the continuance of the plan with modification only of the stall rental rate. The plaintiff and his associates have had the full benefit of the Mabuni Plan. By the equitable principles of justice and fair play inherent in the species of estoppel here applicable, they will not be permitted, under these facts, to prevail in the inconsistent position they now have taken of asserting the invalidity of the plan.

In *Hartmann et als.* v. *Bertelmann et als.*, 39 Haw. 619,

the governing principle and supporting authorities are given at 628, as follows: "This doctrine is well stated in the New Jersey case of *Montclair Trust Co.* v. *Russell Co.*, 135 N. J. Eq. 570, 573, 39 A. (2d) 641, 643, as follows: " 'But there is a species of equitable estoppel, sometimes called *quasi*-estoppel, which has its basis in election, waiver, acquiescence, or even acceptance of benefits and which precludes a party from asserting to another's disadvantage, a right inconsistent with a position previously taken by him. 31 C.J.S. 341. [31 C.J.S., Estoppel, § 107, p. 341.] No concealment or misrepresentation of existing facts on the one side, no ignorance on the other, are necessary ingredients.' (See also 31 C.J.S., Estoppel, §§ 107, 114; *Humes Const. Co.* v. *Philadelphia Casualty Co.*, 32 R.I. 246, 79 Atl. 1; 19 Am. Jur., Estoppel, §§ 61, 64.)"

In *Yuen* v. *London Guar. & Acc. Co. et al.*, 40 Haw. 213 at 229-230 it is similarly laid down that: " 'The estoppel claimed by appellant and recognized by the above-mentioned cases is that form of estoppel *in pais* called by text-writers and known to jurists as *quasi* estoppel. This class of estoppel is sometimes expressed in the language of the rule or maxim that one cannot blow both hot and cold. It is based upon the broad equitable principle which courts recognize, that a person, with full knowledge of the facts, shall not be permitted to act in a manner inconsistent with his former position or conduct to the injury of another. To constitute this sort of estoppel the act of the party against whom the estoppel is sought must have gained some advantage for himself or produced some disadvantage to another; or the person invoking the estoppel must have been induced to change his position, or by reason thereof the rights of other parties must have intervened. [10 Cal. Jur. 645.] * * *.' (*McDaniels* v. *General Ins. Co.*, 1 Cal. App. [2d] 454, 459, 36 P. [2d] 829, 833.)"

Also pertinent, particularly in respect to the lack of grounds for injunctive relief herein, is the statement in *Wong* v. *Public Util. Comm.*, 33 Haw. 813 at 816, that: "* * * The option lay with the appellee to conform to the law and to secure a certificate of convenience and necessity with its attendant benefits or insist upon the invalidity of the statute and stand upon the constitutional and statutory rights and privileges which he believed the statute invaded. He chose the former course. By such voluntary acceptance of benefit he is now estopped from assailing the validity of the statute. To paraphrase the language of the court in *American Bond & Mortgage Co.* v. *United States,* 52 F. (2d) 318, 321: 'Having sought and secured a certificate of public convenience and necessity with its attendant benefits appellee obviously cannot later assert rights which were surrendered in order to secure the certificate.' "

Appellee urges that since estoppel is an affirmative defense and as it was not pleaded by the defendant it was not put in issue below and may not now be considered. The contention is left to rest with reference to Rule 8 (c) and Rule 12 (h) Hawaii Rules of Civil Procedure.

Estoppel is an affirmative defense which is required to be pleaded by Rule 8 (c) and, if not pleaded, is to be taken as waived under Rule 12 (h). However, Rule 15 (b) must also be considered. It provides in part: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues." The effect of this provision is stated in Moore, *Federal Practice,* 2d Ed. Vol. 2,

p. 1696 note 30, as follows: "Failure to plead an affirmative defense is immaterial if evidence of the defense is introduced and not objected to for failure to plead it, and no surprise is claimed." The statement is, as a general proposition, borne out by the authorities. *Knudson* v. *Boren,* 261 F. 2d 15, 19 (10th Cir.); *Farm Bureau Co-Op. Mill & Supply* v. *Blue Star Foods,* 238 F. 2d 326, 332 (8th Cir.); *Tillman* v. *National City Bank of New York,* 118 F. 2d 631, 635 (2d Cir.); and *Firemen's Ins. Co. of Newark, N.J.* v. *Show,* 110 F. Supp. 523, 530 (D. Mont.).

The record indicates that in the trial of this action counsel for each of the parties apparently concentrated on the issue involving the construction of Section 3 of Ordinance No. 79 to the neglect of any other possible issue or issues. However, as has been shown, evidence supporting an estoppel defense was admitted. Most of this evidence, enough at least to sustain the defense, was admitted without objection. Portions of the evidence pertaining to estoppel were objected to, but only on the grounds of incompetency, immateriality and irrelevancy. The trial court noted the existence of and ruled on the issue. On the state of the evidence the court, despite the theories of counsel and notwithstanding the lack of an estoppel plea, had the right, if not the duty, to do so. *Knudson* v. *Boren, supra,* and *Territory* v. *Branco,* 42 Haw. 304, 311. By the provisions of Rule 15 (b), estoppel, under the circumstances related, was properly in issue before the trial court. It is accordingly cognizable on this appeal. *Shelley* v. *Union Oil Co. of California et al.,* 203 F. 2d 808 (9th Cir.).

Appellee further urges that "the mere 'joining' of the 'Mabuni Plan', of itself, does not give rise to estoppel inasmuch as the evidence does not disclose that Plaintiffs-Appellees did agree or consent to the payment of" the doubled parking fee for each of their buses. In effect, the argument is that they were coerced or forced to submit to

the plan. The point is predicated solely on the following excerpt from Isidro Godoy's testimony on direct examination:

"Q. After the Mabuni Plan was taken into effect, you got only one bus; you jack-up the other bus?

A. Yes, sir.

Q. How much rental you pay from then on?

A. $16.00.

Q. Why didn't you pay only $8.00?

A. Well, our director in this park—if we no pay $16.00, he no give us the sign.

THE COURT. What's that?

THE WITNESS. If we no give the $16.00 to the dispatcher or the director, he no give our sign, we no work, so we got to pay $16.00 so that they give us the sign so that we can work."

We learn from the testimony of the director of the Bus Control Committee that the "sign" referred to was a printed display sign given to each operator designating the particular route his bus was to take and also that if an operator didn't get a "sign" it was not by reason of anything in the Mabuni Plan, but for his failure to make the monthly payment due from him. A defaulting owner of a bus covered by only one certificate number was subject to the same treatment. We do not take this evidence as showing duress. *Territory* v. *Tue Bun,* 20 Haw. 267. It is very clear from other evidence that participation in the plan originally was and at all times remained wholly optional.

The final point made by appellee is that the defense cannot prevail for the reason that: "* * * estoppel is never allowed or applied where it would be an instrument to enforce an act which is illegal and contrary to law." 31 C.J.S., *Estoppel,* § 63, p. 251, is referred to for this proposition. The full text of the reference and the cases cited

in support of it indicate that the rule relied on is not intended to and does not cover the kind of situation we have in this case, where the purported illegality consists only of a lack of authority in the Bus Control Committee to fix the rate for parking fees. What the rule is intended to cover and prevent is the use of estoppel in aid of the enforcement of an act or transaction which is directly prohibited by law, e. g., where the allowance of an estoppel would validate an act affirmatively made illegal by statute or would permit the enforcement of an executory contract in violation of a penal law. The type of "illegality" contemplated by the cited rule is indicated by the following holdings. "* * * estoppel cannot make valid that which the Constitution and laws of a state make absolutely invalid, * * *." *Joy* v. *Godchaux,* 35 F. 2d 649, 652 (8th Cir.). "* * * Acquiescence cannot clothe with legality a positively illegal act. One cannot ordinarily be estopped to assert the direct violation of a decisive prohibition of statute or the unenforceability of a contract contrary to law. * * *" *Commissioner of Banks* v. *Cosmopolitan Trust Co.,* 253 Mass. 205, 148 N.E. 609, 614. "* * * 'Not even estoppel can legalize or vitalize that which the law declares unlawful and void.' " *Georgia Public Service Com'n* v. *Atlanta Gas Light Co.,* 205 Ga. 863, 55 S.E. 2d 618, 634. However, it is not a sufficient ground for the recovery of fees or other charges paid to a government agency, that authority to make or impose a charge was lacking.

In *Seattle B. & M. Co.* v. *Treasurer,* 17 Haw. 364, 366, appellee's contention to the contrary is answered in the following language: "The action is based on the theory of an implied promise to pay back moneys illegally demanded and paid under compulsion. There can be no recovery if the demand was legal though the payment was compulsory, nor if the payment was voluntary though the demand was illegal. * * *"

In 70 C.J.S., *Payment,* § 133, pp. 341-3, it is stated: "Except where otherwise provided by statute, it is a well settled general rule that a person cannot, either by way of set-off or counterclaim, or by direct action, recover back money which he has voluntarily paid with a full knowledge of all the facts, and without any fraud, duress, or extortion, although no obligation to make such payment existed. * * *" And in 40 Am. Jur., *Payment,* § 157, pp. 820-2: "It is a universally recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back on the ground that the claim was illegal, or that there was no liability to pay in the first instance. * * * The rule applies to cases in which one of the parties is the government, and money voluntarily paid to the government cannot be recovered. * * *"

*Oliver* v. *Hall County Memorial Hospital,* 62 Ga. App. 95, 8 S.E. 2d 138, illustrates application of the rule under consideration. In that case the county brought suit to recover for expenses incident to an operation performed on the defendant in the county hospital. The hospital was established in an abandoned building which had been constructed for and formerly had been used as a paupers' home. The hospital was established for impecunious patients, but was open to the public on condition that those patients who were able to pay should pay for the services rendered them. The defendant, in resisting the suit, contended, *inter alia,* that the action should fail because the county board was without legal authority to undertake the business of operating a hospital. The court held that since the county board, by statute, was given the express authority to make rules and regulations for the benefit of paupers and to promote the health of the county, by implication it had the power to maintain a hospital for the

benefit of paupers and to incidentally make charges for the use of the hospital by those who were able to pay therefor and, in default of payment, to sue for such charges. The court also held that the defendant was estopped to deny the validity of the charges made against him, stating in that respect: "Furthermore, we are of the opinion that where one has received the benefit of a contract (express or implied) with a county (a corporation) he is estopped to deny the power of the county to make said contract. Here the defendant received the benefit of the county's hospital, its nurses, interns, its medicines, its anaesthetics, its operating room, and all of its facilities under a promise to pay therefor. Can he now deny the power or authority of the county to operate said hospital and make said contract? We think not; he is estopped, for he has received a benefit. * * *" (p. 140).

Another illustrative case is *Tovrea Packing Co.* v. *Live Stock Sanitary Board*, 44 Ariz. 151, 34 P. 2d 420. In it the plaintiff sought to recover the amount of certain meat inspection and stamping fees it had paid and which it claimed the defendant board had no legal authority to impose. In affirming a denial of recovery the court states, at 422: "Assuming, without admitting, that the condition annexed to the proviso above set forth to the effect that plaintiff must pay the 20-cent fee for carcasses which it has elected under the act not to have stamped is invalid for the reasons above given, is plaintiff in a position to complain thereof? It is the general rule of law that, when parties have sought or derived benefit by exercising a privilege bestowed upon them by law, they will be estopped from denying the validity of terms fixed as a condition for the exercise of such privilege. * * *"

There is no element of fraud or duress in this case. Plaintiff's election to join and remain under the Mabuni Plan was a matter of free choice. The evidence shows

that he continued to receive the benefits of the plan even after he had filed this suit. He was therefore, under the applicable law, estopped from attacking the validity of the plan and the charges for parking fees made against him under it. Judgment dismissing the complaint should have been entered for the defendant.

Reversed.

*Cyril S. Kanemitsu,* Deputy County Attorney, (*Yoshito Tanaka,* County Attorney, *Benjamin Menor,* Deputy County Attorney, on the briefs), for defendant-appellant.

*John T. Ushijima (Pence & Ushijima* on the brief), for plaintiffs-appellees.