HONOLULU CONSTRUCTION & DRAYING COMPANY, LIMITED *v.* TERRACE DEVELOPERS, LIMITED, STATE, LIMITED, INTERVENER.

No. 4311.

SEPTEMBER 25, 1964.

TSUKIYAMA, C.J., CASSIDY, WIRTZ, LEWIS AND MIZUHA, JJ.

70

OPINION OF THE COURT BY LEWIS, J.

This is an appeal by intervener, State, Limited, doing business as State Tile, hereinafter referred to as "State Tile." On April 21, 1961, before the present case was brought, State Tile commenced an action against Richard S. Konno, doing business as Acme Contractors, hereinafter referred to as "Acme." In this action it was alleged that Acme owed State Tile the sum of $39,000 for goods sold and delivered between January 15, 1959 and March 15, 1961. Acme defaulted and on July 6, 1961 judgment was entered against this debtor in the sum prayed for, with interest and costs. Thereupon garnishee summons was issued against a number of garnishees not here involved. On August 29, 1961, an alias garnishee summons was served on Terrace Developers, Ltd., hereinafter referred to as "Terrace." No return to the garnishee summons has been filed by Terrace.

The case now before us commenced September 15, 1961, when Honolulu Construction & Draying Company, Ltd., hereinafter referred to as "HC&D," filed its complaint against Terrace alleging that: "By agreement dated July 11, 1960, Acme * * * assigned to plaintiff the sum of eighteen thousand one hundred ninety-eight dollars ($18,198.00) owed by defendant [Terrace] to Acme * * *." Upon the trial it appeared that this agreement of July 11, 1960 was not followed by or made the subject of any filing of notice to creditors of Acme in the Bureau of Conveyances of the State under Chapter 187, Revised Laws

of Hawaii 1955.[1] State Tile, the intervener, bases its case on this statute.

HC&D conceded by its complaint that Terrace had paid it $2,500. It alleged there was an unpaid balance of $15,698 owed it by Terrace. By its answer Terrace admitted the agreement of July 11, 1960, but in effect denied that it was absolutely liable to HC&D. It contended that, by reason of certain terms and conditions contained in its agreement with Acme of February 5, 1960 for masonry work on Terrace's projected cooperative apartment building, its liability depended on the obtaining of a mortgage loan not yet secured. This agreement of February 5, 1960 was the source of Terrace's original indebtedness to Acme.

The trial court held against Terrace's defense, construing the agreement as providing for payment out of "any funds" of Terrace, including but not limited to funds obtained from mortgage loans. However, when the case came on for trial a new issue was injected. At that time, January 23, 1962, State Tile orally requested permission to intervene,[2] stating that its interest was to protect its position as a judgment creditor of Acme having a prior garnishment against Terrace. Both HC&D and Terrace stated that they did not resist the intervention and it was permitted. We first consider State Tile's standing on this appeal.

HC&D argues that since Terrace took no steps in the matter it could be made to pay both its claim and that of State Tile even if by doing so it paid twice.[3] Terrace's

---

[1] The pertinent provisions of the statute are set out in note 12.

[2] State Tile's attorney informed the court that only late on the previous night had he learned of HC&D's suit. The evidence shows that State Tile itself only heard of the agreement of July 11, 1960 on coming into court on the morning of the trial.

[3] According to the findings of the court below, "during the months of January through April, 1960, defendant [Terrace] paid Acme Masonry Contractors the sum of $31,507.46" pursuant to the agreement of Febru-

position might indeed have been precarious had State Tile not intervened, but since it did intervene and was permitted to do so, without objection, notwithstanding the absence of a proper pleading setting forth the intervener's claim, the question squarely presented is: Does the agreement of July 11, 1960 defeat State Tile in its efforts to collect its judgment against Acme by pursuing Acme's rights against Terrace under the agreement of February 5, 1960?

This is not an abstract question. It is a question which would have been presented in the garnishment proceeding in State Tile's suit if Terrace had made a return to the garnishment summons asserting that, by reason of the agreement of July 11, 1960, there was no debt due from it to Acme. Terrace thereby would have subjected itself to examination by State Tile as to its liability pursuant to R.L.H. 1955, § 237-1(c); or Terrace might have availed itself of the provision of R.L.H. 1955, § 237-9, that: "With

---

ary 5, 1960; also, "on July 14, 1960, defendant [Terrace] paid to plaintiff [HC&D] the sum of $2,500 in accordance with the agreement [of July 11, 1960]"; further, "at some time during the month of July, 1960, defendant made further payments of $1,000 and $13,000 directly to Acme Masonry Contractors." However, according to the testimony these were round figures; the last mentioned payments may have been, in fact, $1,000 and $13,514.37; and the $13,514.37 may have included the $2,500 paid HC&D. After these payments there remained a balance of $13,992.54 according to the findings, or $13,478.17 to $15,978.17 according to the testimony, which is the balance unpaid on the original $62,000 contract between Terrace and Acme if that contract retains its effectiveness. While no attack has been made on the court's findings as to the amounts of the several payments we have noted the scope of the testimony at this point, as it constitutes background for our discussion of the question in issue as hereinafter developed.

HC&D claims that even if State Tile's garnishment is good to the amount of the balance remaining unpaid on the original $62,000 contract of February 5, 1960, nevertheless Terrace is absolutely indebted to HC&D for the balance of $15,698 unpaid out of the total of $18,198 provided for by the agreement of July 11, 1960. Insofar as the disposition of this contention depends upon the status of the payments made by Terrace directly to Acme in July, 1960, we make no decision on the point, but leave the same for determination upon remand of the case should the point become material. Insofar as the disposition of this contention depends upon the status of the balance remaining unpaid on the original $62,000 contract, we hold that the matter is before us.

or without payment into court, any garnishee may, where there are conflicting claims to any moneys held for safekeeping, debt, goods or effects in his hands of any amount, make application for an interpleader order in the manner provided by section 230-11 for defendants, and the judge or magistrate shall thereupon make all orders as appear to be just and reasonable." In effect, State Tile anticipated such a return on the part of Terrace and by intervention in HC&D's suit sought a declaration that no defense or conflicting claim under the agreement of July 11, 1960 could defeat State Tile's garnishment. Though, at the time of the intervention, the matter had not ripened into an "actual controversy"[4] as no such return had been made or action taken by Terrace, this was because of negligence or a lack of awareness of its precarious position on the part of Terrace. After the intervention the existence of an actual controversy became clear. As testified by the president of Terrace, it became afraid that if it paid HC&D, then State Tile would make it pay over again.

It is clear from the record that the question whether the agreement of July 11, 1960 was a valid defense to State Tile's garnishment was an issue tried and decided below by consent of all parties. Pursuant to H.R.C.P., Rule 15(b),[5] applied in *Godoy* v. *County of Hawaii,* 44 Haw. 312, 321, 354 P.2d 78, 83, the informal manner in which the question was presented does not take it out of the case. And the circumstance that the garnishment proceeding might have provided a forum for litigation of this issue did not preclude State Tile from seeking another

---

[4] See R.L.H. 1955, Chapter 228, re declaratory judgments.

[5] "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. * * *"

one.[6] Nor is it an obstacle that it was only after State Tile's intervention that the existence of an "actual controversy" became clear, since a supplemental pleading could have been allowed under H.R.C.P., Rule 15(d) and, again, the general agreement to the informal procedure followed by State Tile obviated the necessity therefor.

When the court held as it did:

"That Exhibit '1' [the agreement of July 11, 1960] is not an assignment of accounts receivable of Acme Masonry Contractors, but sets forth a contractual obligation on the part of the defendant to plaintiff as the third-party beneficiary, and the third-party intervenor, State Limited, is therefore not entitled to a priority over such obligation by virtue of Section 187-3, Revised Laws of Hawaii, 1955,"

State Tile was aggrieved thereby and by the consequent judgment that State Tile "take nothing by way of this action." That amounted to a declaration that State Tile's garnishment of August 29, 1961 was defeated by the agreement of July 11, 1960. Any further garnishment or creditor's bill seeking to reach Acme's rights against Terrace under the agreement of February 5, 1960, would be similarly defeated.

We agree with HC&D that the mere circumstance that intervention was allowed without objection is not decisive of the question whether State Tile presently has a justiciable interest as a party aggrieved. *Cf., Terrill v. City of Tacoma,* 195 Wash. 275, 80 P.2d 858; *Anderson v. Carder,* 159 Kan. 1, 150 P.2d 754; *Kreatchman v. Ramsburg,* 224 Md. 209, 167 A.2d 345. Our conclusion on this phase of the case is based upon our determination that State Tile was aggrieved by its failure to secure a declaration that its right to collect from Acme out of Acme's right to the

---

[6] H.R.C.P., Rule 57.

payment of money under the agreement of February 5, 1960, was superior to and not defeated by the agreement of July 11, 1960.

HC&D contends that State Tile's garnishment of August 29, 1961 "reached no debt and secured no funds," because Terrace deemed its liability contingent upon the obtaining of a mortgage loan and, so it is argued, "garnishment reaches only those debts which are admitted or acknowledged by the garnishee and not obligations which are controverted, disputed or denied." For this proposition HC&D cites *Theo. H. Davies & Co.* v. *Hilo Pineapple Co., Ltd., Willfong, Garnishee,* 27 Haw. 651. As clarified by the further opinion in the companion case of *Bishop Trust Co.* v. *Hilo Pineapple Co., Ltd., Willfong, Garnishee,* 27 Haw. 749, and by the opinions in *Bishop Trust Co.* v. *Furstenburg,* 28 Haw. 528, and *Henry Waterhouse Trust Co.* v. *King,* 33 Haw. 1, 16, the garnishee in the *Davies* case was discharged because, under the statute as it then read, the garnishee could not be examined after judgment. Accordingly, the rule that a garnishee's denial of indebtedness to the defendant cannot be impeached by the plaintiff by evidence *aliunde* governed the *Davies case.* Where, however, upon examination of the garnishee it appears from the undisputed facts that the garnishee's denial of indebtedness is an erroneous legal conclusion, a denial of indebtedness in the garnishee's return is not conclusive and "the court must pronounce the correct legal conclusion of which the undisputed facts admit." *Bishop Trust Co.* v. *Furstenburg, supra,* 28 Haw. at 533.

It therefore is clear that Terrace's mere denial of indebtedness to Acme, if interposed in the garnishment proceeding as it was in the present suit, would not be decisive. What is not clear is the effect of State Tile's garnishment in view of the provision, contained in the agreement of February 5, 1960, that after the initial $23,000 Acme was

to be paid only as funds became available from apartment sales or otherwise. Whether Terrace had funds in hand at the time of service of the garnishee summons[7] does not appear. Nor do we think it proper to determine in this proceeding whether, by virtue of the above-noted provision of the agreement of February 5, 1960, Terrace's liability to Acme was contingent and hence not subject to garnishment,[8] or whether on the other hand this presented a case in which the debt simply was not yet due and payable, so that R.L.H. 1955, § 237-10, applied.[9] We should not anticipate this point, as the record indicates that there may be other creditors of Acme not now before us. An actual controversy exists even if Acme's rights against Terrace under the agreement of February 5, 1960, were not garnisheeable and would have to be pursued by other means.

Regarding itself as "a general creditor of Terrace," HC&D further argues that: "No judgment has been obtained against funds owed Acme," contending that a question of priority can be considered only when there are conflicting claims against a specific fund which is insufficient to satisfy all of the claims. Here, however, the argument advances into the merits, and it is in that connection that we have considered it.

We have concluded that State Tile could and did appeal from the judgment as a party aggrieved. HC&D's motion to dismiss the appeal on the ground of lack of standing

---

[7] Terrace's president testified that all the apartments were sold except one which "has come back to us by virtue of a fellow going to the mainland." The apartments were sold on "small down payments," so presumably installment payments continued to be made.

[8] Cf., *Miyashiro* v. *Yap*, 27 Haw. 297, 306-07; *Souza* v. *Smith*, 11 Haw. 202.

[9] "§ *237-10. Debts payable in future.* If upon disclosure made on oath by the debtor it appears that the garnishee is indebted to the defendant, but that the debt is not payable and will not become due until some future time, then such judgment as the plaintiff may recover shall constitute a lien upon the debt until and at the time it becomes due and payable."

on the part of State Tile, as to which we heretofore reserved decision, at this time is denied.

The agreement of July 11, 1960 was executed by Terrace and Acme. It provided:

"WHEREAS, Terrace is indebted to Acme in the sum of *Eighteen Thousand One Hundred Ninetyeight and no/100*—DOLLARS *($18,198.00)* as and for labor performed and materials furnished in connection with the construction of that certain 24-units apartment building at 2450 Date Street, Honolulu aforesaid; and

"WHEREAS, Acme is indebted to H. C. & D., of Honolulu aforesaid, in the sum of *Eighteen Thousand One Hundred Ninetyeight no/100*—DOLLARS *($18,198.00);*

"NOW, THEREFORE, in consideration of the mutual covenants of the parties hereto as herein contained, the parties hereto agree as follows:

1) Terrace does hereby assume and agree to pay the amount, to-wit, *Eighteen Thousand One Hundred Ninetyeight no/100*—DOLLARS *($18,198.00)* due and owing H. C. & D. in the account of Acme; and

2) Acme does hereby release and discharge Terrace its successors and assigns from any and all claims for labor performed and materials furnished in connection with the construction of that certain 24-units apartment building at 2450 Date Street, Honolulu aforesaid, including but not limited to the amount of *Eighteen Thousand One Hundred Ninetyeight and no/100*—DOLLARS *($18,198.00)."* (Italics indicate matter filled in on another typewriter, apparently after the agreement was drafted with blanks therein.)

As appears from note 3, the findings of the trial court do not set out the amount of the balance unpaid on the February 5, 1960 agreement between Terrace and Acme as of the time of the agreement of July 11, 1960. This is

left in doubt because the findings do not determine at what dates in July, 1960, the $1,000 and $13,000 payments were made,[10] whether before or after the agreement of July 11, 1960. Upon one view of the evidence the amount unpaid on the $62,000 contract as of July 11, 1960 was more than the $18,198 then due from Acme to HC&D.

It will be noted that according to the agreement of July 11, 1960, Acme discharged Terrace from "any and all claims for labor performed and materials furnished" in connection with the apartment project which was the subject of the February 5, 1960 agreement, "including but not limited to the amount of Eighteen Thousand One Hundred Ninetyeight and no/100 Dollars ($18,198.00)." The testimony shows that the $62,000 figure fixed by the agreement of February 5, 1960 consisted of two figures, $51,000 as the bid price for the masonry work and $11,000 characterized by Terrace's president as a "bonus" for "forbearance" in payment of the amount over $23,000. That is, the agreement provided that only $23,000 was to be paid in "regular progress payments." The balance was to be paid "out of any funds including proceeds from the sales of apartments, and from any mortgage loan obtained and held by developer in connection with said sales and the building and erection of said cooperative apartment building, to the extent and in such amounts and at such times as shall be available for such disbursements." By the agreement of February 5, 1960, Acme agreed not to file any mechanics' or materialmen's liens for this balance.

On one view of the evidence,[11] there had been paid prior to the July 11, 1960 agreement the sum of $32,507.46 ($31,507.46 in the period January-April, 1960, and $1,000 in July, 1960), leaving $18,492.54 unpaid on the

---

10 See note 3.

11 See note 3.

$51,000 bid price, plus the $11,000 "bonus." Terrace's president testified that on July 11, 1960, the masonry work for which Acme was responsible had not been completed. As to the purpose of Acme's release of Terrace "from any and all claims for labor performed and materials furnished," contained in the July 11, 1960 agreement, Terrace's president testified:

"Q. You made him put that in order to avoid mechanic's lien?

"A. That's right, because we know there was a $11,000 bonus in this matter."

But this witness previously had testified:

"THE COURT: It says here, 'Acme hereby releases and discharges—' He discharged you, didn't he?

"MR. SPECTOR [Terrace's president]: That is correct."

The pertinent provisions of Chapter 187, Revised Laws of Hawaii 1955, are set forth in a footnote.[12] According

---

[12] "§ 187-1. *Definitions.* Wherever used in this chapter, unless the context or subject matter otherwise requires:

" 'Account' or 'account receivable' means an existing or future right to the payment of money under an existing contract, the assignment of which right is not subject to special statutory provisions of the [State] or of the federal government relative to the rights of creditors of the assignor, and which right to payment is not represented by a judgment, a negotiable instrument, or a writing of which surrender is required by the obligor's contract for its enforcement.

" 'Assignee,' 'assignment,' 'assignor' and 'debtor' are limited respectively to an assignee, assignment, assignor of and debtor on an account receivable. * * *

" 'Assignment' means any transfer of an account, other than by operation of law, including a transfer as security, and the creation by agreement of a lien upon an account.

\*      \*      \*      \*      \*      \*      \*      \*      \*

" 'Proceeds in any form' of an account include any interest in or benefit accruing from an account, any judgment arising from an account, money or other thing of value received in payment of an account, in whole or in part, in any manner, any obligation taken as absolute or conditional payment of or upon an account, collateral security taken for an account, and goods, the sale of which gave rise to the account, not in the possession of the debtor.

\*      \*      \*      \*      \*      \*      \*      \*      \*"

"§ 187-2. *Validity as to creditors and subsequent assignor; effect of*

to Standing Committee Report No. 337 of the House Judiciary Committee, Twenty-Sixth Territorial Legislature, Regular Session of 1951, House Journal 1951, p. 491:

"The purpose of this bill is to clarify the law with respect to the rights of successive assignees of accounts receivable, and the rights as between the assignee of an account receivable and creditors of the assignor. The bill is modelled, in general, upon the statutes of Washington and Utah.

"The existence of uncertainties with respect to the legal relationships which are the subject matter of this bill has occasioned the enactment of legislation clarifying the law in thirty-three or more of the states,

---

*notice; rights of unnotified debtor.*

"(a) Subject to the provisions of section 187-3, a written assignment, signed by the assignor, of an account for value, shall be valid as against, and shall have priority as to such account over, present and future creditors (excepting creditors having existing specific liens on the account when assigned) of the assignor and subsequent assignees of such account. Every effective and uncanceled notice filed pursuant to the provisions of this chapter shall be held and considered to be full and sufficient notice to all the world of all assignments taken thereunder. The validity of any such assignment of an account shall not be affected by failure to notify the debtor.

"(b) A debtor, irrespective of the provisions of section 187-3, until notified of the assignment by the assignor or the assignee, may pay or otherwise deal in good faith with the assignor, his agent for collection or any successor to the assignor's interest, and shall have as against the assignee, unless he has otherwise agreed, any right of setoff, counterclaim or defense against such assignor or person existing in his favor at the time he is so notified."

"§ 187-3. *Notice, filing and form.*

"(a) No assignment of an account shall be valid as against present or future creditors of the assignor, or as against a subsequent assignee of such account without knowledge of such assignment, unless such assignment is in writing and is signed by the assignor, and unless there is on file in the office of the registrar, at the time of making of such assignment or within thirty days thereafter, an effective and uncanceled notice signed and acknowledged by the assignor and the assignee containing a designation of the assignor and the assignee, and of the chief place of business of each within this [State], if any; and if the assignor has no place of business within the [State] a designation of his chief place of business outside the [State]; and a statement that the assignor has assigned or intends to assign one or more accounts receivable to the assignee. * * *

"(b) The following form of notice (or any other form of notice con-

most of the clarifying statutes having been enacted in 1947 and 1949. The statutes of the various states are fairly evenly divided between those declaring that a written assignment of an account receivable shall be valid as against all creditors and subsequent assignees without notice to the account debtor and without any formal notice to the public, and those providing that such assignments shall be so valid only if made during the effective period of a notice filed with some public officer. This bill follows the pattern of the statutes in those states which require notice filing for the validation and protection of such assignments. * * * In order to be valid against subsequent assignees

---

taining substantially the same information) shall suffice for the purposes of this chapter:

" 'NOTICE OF ASSIGNMENT OF ACCOUNTS RECEIVABLE

" 'The assignor, _____, whose chief place of business within this [State] is at _____ (or who has no place of business within this [State] and whose chief place of business outside this [State] is at _____), has assigned or intends to assign one or more accounts receivable to the assignee, _____, whose chief place of business within this [State] is at _____

Signed_____
Assignor
Signed_____
Assignee'.

\*        \*        \*        \*        \*        \*        \*        \*        \*"

"§ 187-4. *Assignor as trustee; assignee's right or lien not invalidated by assignor's acts or omissions.* The assignor of an account shall be a trustee for the assignee of the proceeds in any form of the account and of any of the property sold, which is returned to or recovered by the assignor. * * * The rights of an assignee upon property so held in trust shall be superior to the rights of all present and future creditors of the assignor and subsequent purchasers of the property, when such property is set aside or designated in a manner indicating that the assignee has an interest therein.

\*        \*        \*        \*        \*        \*        \*        \*        \*"

"§ 187-7. *Operation of chapter.* The provisions of this chapter shall not affect the validity of an assignment as between the parties thereto, and shall not be applicable to any assignment made for the benefit of all of the assignor's creditors generally. The provisions of this chapter shall not affect the rights or remedies of any person to reach any property which is transferred by an assignment which is fraudulent as to creditors."

and creditors of the assignor, it is necessary that assignments of accounts receivable be made under a notice so filed. * * *

"Your Committee believes that enactment of this bill will furnish a useful tool for the financing of new businesses during the periods of their growth. Financing procedures now in use are not adversely affected."

As appears from the committee report, statutes of this type are prevalent. It generally is accepted that the background of these statutes is to be found in *Corn Exchange Nat'l Bank* v. *Klauder*, 318 U.S. 434 (1943). See *Miami Nat'l Bank* v. *Knudsen*, 300 F.2d 289, 291 (5th Cir. 1962). In the last cited case it was held that, under the Florida statute there involved, notification to account debtors of the assignment of accounts receivable, while sufficient to perfect the assignment before the enactment of the Florida statute, was not sufficient after the statute was enacted, because "the statute establishes a mandatory, exclusive system of perfecting assignments of accounts receivable." The court reviewed the Bankruptcy Act provisions involved in *Corn Exchange Nat'l Bank* v. *Klauder, supra,* which as amended in 1950, before enactment of our statute or the Florida statute there involved, provided that a "preference" is a "transfer" made under certain conditions, and that a transfer of property other than real property should be deemed to have been made when "so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee." After holding that "State law determines when the transfer becomes perfected" and noting that the Florida statute was silent on the question whether notice-filing was, under the statute, the exclusive method for perfecting an assignment of accounts receivable so as to place them beyond the reach of subsequent legal or equitable proceedings, the

court held nevertheless that it was the exclusive method, upon application of reasoning which we find applicable also under our statute.

It has been argued that the purpose of the statute is to protect those who advance money or credit on the security of accounts receivable. By its terms the statute protects present creditors against unrecorded assignments,[13] and is not limited to the protection of one who makes a new loan on the strength of an assignment. And invalidity, against other creditors, of an unrecorded assignment in favor of one creditor, necessarily defeats the favored creditor even though the debtor has promised to pay him, if the intervention of the rights of other creditors prevents the discharge of the debtor by such payment with a consequent failure of consideration for the promise. We cannot agree with HC&D's contention that the statement in section 187-7 that "The provisions of this chapter shall not affect the validity of an assignment as between the parties thereto" protects HC&D irrespective of State Tile's right to pursue Acme's claim against Terrace.

Turning now to the application of the statute in the case before us we note that while HC&D was not a signatory of the agreement of July 11, 1960 it did accept its provisions.[14] This leads to the question how the accounts

---

[13] Cf., *Northern Counties Bank* v. *Earl Himovitz & Sons Livestock Co.*, supra, 31 Cal. Rptr. 551; *Mottet* v. *Stafford*, 94 Wash. 572, 162 Pac. 1001; *Lewis* v. *Lougee*, 63 N.H. 287.

[14] HC&D's credit manager testified:
"Q. Did you have any agreement with Acme?
"A. The agreement that we had with Acme was that we were pressing for payment, and he suggested he had this money coming from Terrace Developers. In a conversation he stated he would be willing to initiate an assignment to us for the amount owing.
"Q. Who is he?
"A. Richard Konno of Acme Contractors.
"Q. Did you get an assignment?
"A. We did and that's it.
"Q. Do you consider this an assignment?
"A. Correct.
"Q. To HC&D?

were handled after the agreement of July 11, 1960. HC&D's credit manager testified:

"Q. Has that $2,500.00 been credited to the account of Acme Masonry?

"A. Yes."

\*     \*     \*     \*     \*     \*     \*     \*     \*

"A. * * * [W]hen we received the assignment we considered that, you might say, payment of the account as far as Konno [Acme] was concerned. We felt that that money was coming to him and that it was above board, and if he was willing to make this assignment, which was accepted by Mr. Spector for his organization [Terrace], and so forth, we considered that further pressure on Acme was of no consequence.

\*     \*     \*     \*     \*     \*     \*     \*     \*

---

"A. Correct."

Previously this witness had testified that the agreement of July 11, 1960 was in the possession of HC&D from the time it was executed. He further testified:

"A. * * * When we began pressing Acme, his claimant, they indicated they had this money coming to them from the Terrace Developers which would have covered the amount owing to us so that at that point we asked them to initiate this assignment in order to allocate the portion of those funds to HC&D to credit their account with us."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"A. * * * Mr. Konno of Acme Contractors advised me that he had owing from them a sum of money which would be more than we have to cover our charges, and that he would be willing to execute an assignment on it."

Terrace's president testified:

"Q. [By Mr. Kanazawa]. One more question, Mr. Spector. At that time this Exhibit No. 1 was prepared, did you inform HC&D about its preparation? This is the assignment. Did you inform HC&D of this assignment?

"A. Yes, they were aware of it.

"Q. As a matter of fact, wasn't it HC&D that requested an assignment be prepared?

"A. Correct."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"THE COURT: Mr. Spector, how did you arrive at the figure of $18,198.00 as being monies you owed or Terrace owed to Acme?

"MR. SPECTOR: Mr. Brock [HC&D's credit manager] put that figure. This was the total amount owing by Acme to HC&D not as a result of our job but other jobs."

"A. * * * [W]e didn't cancel their [Acme's] account or marked [sic] it off as paid."

\*     \*     \*     \*     \*     \*     \*     \*     \*

"A. We have not billed Terrace Developers.

"Q. You never did?

"A. No, we have only the assignment."

It thus appears that HC&D did not release Acme or accept Terrace as its only debtor. There was no novation of debtors. *Cf., Jan Ban* v. *Tsen Yim,* 15 Haw. 433; *Hawaii Builders Supply Co.* v. *Kaneta,* 42 Haw. 111. What is not at all clear is whether there was a novation of creditors. A novation of creditors may occur even though there is no novation of debtors. *Cf., Hata* v. *Dean Witter,* 32 Haw. 760, 766. The classic example of novation of creditors is stated in 39 Am. Jur., *Novation,* § 2, as follows:

"* * * It was at first used in the common law only to describe a transaction whereby a debtor is discharged from his liability to his original creditor by contracting a new obligation in favor of a new creditor by the order of the original creditor. Thus, A [Terrace] owes B [Acme] one thousand dollars, B [Acme] owes C [HC&D] the same sum and, at the request of C [HC&D], orders A [Terrace] to pay that sum, when it shall fall due, to C [HC&D]. To this A [Terrace] consents, and B [Acme] discharges A [Terrace] from all obligations to him. A [Terrace] thus contracts a new obligation to C [HC&D], and his original obligation to B [Acme] is at an end."

HC&D contends that under the agreement of July 11, 1960 it became a third-party beneficiary. Properly speaking, the contention is that it became a creditor beneficiary. That status is more easily established than is a novation, and in some instances may serve the same purpose. *Smith* v. *Pfluger,* 126 Wis. 253, 105 N.W. 476. However, a third-

party beneficiary usually is subject to the same defenses as could have been asserted against the promisee, and the promisee himself has a right to enforce the contract. *Kaleialii* v. *Grinbaum & Co.*, 9 Haw. 213; 12 Am. Jur., *Contracts*, § 289. Though there is a new promise, it is to pay the old debt. On the other hand, in case of a novation of creditors there is a new promise which only one party can enforce, the debtor is immediately released by the old creditor without awaiting performance of the new obligation,[15] and the new promise may be enforced by the novated creditor irrespective of defenses which might have been asserted against enforcement of the old promise. In such case the old contract no longer subsists. Williston, *Contracts*, §§ 1865, 1867A, 1873 (Rev. Ed.).

Since notice to the debtor to pay a particular creditor would not suffice to protect that creditor against the claims of other creditors, because Chapter 87 prescribes the exclusive method of giving validity to a transfer of an account receivable against the claims of other creditors, the question arises whether a mere promise by the debtor to honor the order so given him takes the case out of the statute. This is not so. *Knowlton* v. *Cooley*, 102 Mass. 233; *Mansard* v. *Daley*, 114 Mass. 408. The account remains in existence. *Allen & Robinson* v. *Redward*, 10 Haw. 151, 157. As in the case of an ordinary assignment the pre-existing defenses apply unless the debtor promises to pay irrespective of such defenses. Section 187-2(b) so provides. *Cf., Commerce Union Bank* v. *Blalock*, 38 Tenn. App. 260, 273 S.W.2d 487. In so providing, section 187-2(b) recognizes that an order on a debtor may be an assignment even though the debtor agrees to honor it.[16]

---

[15] *Cf., Street* v. *Smith Bros. Grain Co.*, 255 S.W. 778 (Tex. Civ. App. 1923).

[16] Section 187-2(b) is set out in note 12. It provides that: "A debtor * * * shall have as against the assignee, *unless he has otherwise agreed,* any * * * defense * * * existing in his favor * * *." (Emphasis added.)

The promise of a debtor to pay a third person creates an "interest in or benefit accruing from an account" within the meaning of "proceeds in any form," defined in section 187-1, and under section 187-4 the promisee holds this promise for the creditor beneficiary who is nonetheless a transferee of the account because of the format employed. Under the terms of the governing statute an agreement is to be treated as an assignment if it effects a "transfer" of the account.[17]

We have considered the statement in 4 Corbin, *Contracts,* § 880, cited by HC&D, that: "An agreement made between a debtor and his creditor that instead of paying the creditor the debtor shall pay a third person to whom the creditor himself is indebted, is not operative as an assignment." The point there made is that the right, if any, of the third person is that of a creditor beneficiary, based on the promise of the debtor. However, the debtor's promise, alone, if no more than a promise to render to the third party the performance otherwise due the party giving the order, merely makes it possible for a creditor beneficiary to assent at a later date,[18] and enforce the contract if it has not been rescinded before he assented. That is, up to the time of the creditor beneficiary's assent, the contract for his benefit can be rescinded by agreement of the debtor and the promisee. 4 Corbin, *Contracts,* § 815, p. 256; 12 Am. Jur., *Contracts,* § 290. Thus it is the assent of the creditor beneficiary which finally perfects the transfer of the account within the meaning of Chapter 187,[19] just as in the case of an assign-

---

[17] Section 187-1, definition of "assignment," set out in note 12.

[18] In the absence of the debtor's promise to honor the order, some communication between the assignor and assignee is necessary if the order is to have any effectiveness. *Associated Metals & Minerals Corp.* v. *Isletmeleri,* 6 Ill. App. 2d 548, 128 N.E.2d 595. The debtor's promise takes the place of this communication. *Cf., Coulter* v. *Morrison,* 30 Haw. 158.

[19] See note 20.

ment arranged without obtaining the debtor's promise.

The only authority cited by Corbin for the statement that a third-party beneficiary arrangement does not operate as an assignment is *Commercial Nat'l Bank* v. *Kirkwood,* 172 Ill. 563, 50 N.E. 219, cited at the end of the paragraph on which HC&D relies, after the author has explained that a third-party beneficiary arrangement requires the "assent and promise" of the debtor. The *Commercial Nat'l Bank* case held that a levy of another creditor, intervening before the creditor beneficiary had assented, defeated the creditor beneficiary. The case is criticized in section 813, page 246, of the same text, the author stating that the decision was correct only if the transaction there involved was "nothing more than an agency transaction." But even if the case involved a creditor beneficiary arrangement it only stands for the proposition that such arrangement falls short of an assignment in its protection of the creditor beneficiary, until he accepts the benefit of the arrangement made between the promisee and the debtor.[20]

In summary, under the terms of the governing statute the agreement of July 11, 1960 is to be treated as an as-

---

[20] On the exact point as to the right of another creditor who levies before the creditor beneficiary knows of and accepts the arrangement made for his benefit the *Commercial Nat'l Bank* case perhaps does not represent the weight of authority. See Williston, *Contracts,* § 362, p. 869, n. 5 (3d ed.), citing *inter alia Baker* v. *Eglin,* 11 Ore. 333, 8 Pac. 280, *Coleman & Carroll* v. *Hatcher & Brannon,* 77 Ala. 217, *Rickman* v. *Miller,* 39 Kan. 362, 18 Pac. 304; *cf., Putney* v. *Farnham,* 27 Wis. 187. In *Pliley* v. *Phifer,* 1 Ill. App. 2d 398, 117 N.E.2d 678, the *Commercial Nat'l Bank* case was distinguished, and it was held that the creditor beneficiary arrangement there involved had the effect of an assignment.

In another case, the question may arise whether Chapter 187 fully protects other creditors. A creditor beneficiary could not be expected to record if he did not know of the arrangement made for his benefit. Section 187-3 presupposes knowledge of the arrangement on the part of the one to whom the account is transferred, or someone acting in his behalf. Whether, without such knowledge, the arrangement between the debtor and promisee would defeat another creditor's levy, is a point that does not arise in this case. Moreover, the possibility of such lack of knowledge on the part of a creditor beneficiary is remote. The record negatives that possibility in the present case.

signment if it effected a "transfer" of Acme's account against Terrace. A transfer effected by obtaining the promise of the debtor to pay a third party who assents thereto and thereby places it beyond the power of the debtor and promisee to rescind the agreement is a transfer within the meaning of the statute. In such case, the original account still exists but the benefit of it has been transferred to a third party.[21] On the other hand, if the original account no longer subsists because a novation has occurred, the case does not come within the scope of the statute. *Northern Counties Bank* v. *Earl Himovitz & Sons Livestock Co., supra,* 31 Cal. Rptr. 551, 557; *Stinson* v. *Caswell,* 71 Me. 510; *Clough* v. *Giles,* 64 N.H. 73, 5 Atl. 835; cf., *J. I. Case Threshing Mach. Co.* v. *Road Improvement District No. 3,* 210 Fed. 366, 368.

We turn now to the question whether, in the present case, a novation was effected so that the case does not come within the scope of Chapter 187, or whether the arrangements fall short of a novation, in which event, as we have held, the agreement of July 11, 1960, constituted an assignment which should have been recorded to be valid against other creditors.

The use of the word "assignment" in the complaint, and in the testimony of HC&D's credit manager, does not preclude the conclusion that there was a novation. As stated in *Bank of the United States* v. *Irving Nat'l Bank,* 203 N.Y. Supp. 906, 909: "The use of the word 'assignment' is in no way inconsistent with the effect of the novation. Indeed, it is frequently used loosely as equivalent to novation, and, in a sense, an assignment is an integral part of the novation." However, the trial court concluded in this case:

"1. That plaintiff's Exhibit '1' [the agreement of

---

[21] HC&D contends that: "The obligation of Terrace Developers to HC&D was not a transfer of a previous debt but was a new debt created by the agreement itself." However, we do not find the cases cited for this proposition helpful upon consideration of the facts here present.

July 11, 1960] is a valid third-party beneficiary contract * * *.

"2. That defendant's obligation under Exhibit '1' and the payment thereof is to be read in connection with paragraph 5(b) of Exhibit 'A' [the portion of the agreement of February 5, 1960 making the payment of sums over $23,000 dependent on the availability of funds.]"

This does not sound like a novation. It indicates that the court viewed the original contract between the debtor [Terrace] and the old creditor [Acme] as still subsisting. On the other hand the judgment was for the absolute payment of $15,698 with interest, and said nothing about the availability of funds.

The effect of the release provision contained in the July 11, 1960 agreement is not clear. This agreement seems to have contained blanks when drafted, which were later filled in. The amount unpaid on the February 5, 1960 agreement, at the time of the July 11, 1960 agreement, may have been more than $18,198. Terrace's president testified that the release provision was put in to avoid mechanics' liens and had something to do with the $11,000 "bonus." HC&D's credit manager testified that he was told by Acme the amount owing Acme "would be more than we have to cover our charges."

Without further enumeration of troublesome points,[22] we hold that the findings and conclusions do not support the judgment against State Tile. There is insufficient

---

[22] As well stated in *Northern Counties Bank* v. *Earl Himovitz & Sons Livestock Co.*, *supra*, 31 Cal. Rptr. 551, 553-4:

"One of the recurrent ironies of adjudication is the necessity of fitting business transactions into the pigeonholes of standardized legal concepts, when the actors were actually thinking only of money. From such characterizations, conceived after the fact by lawyers and judges, flow secondary consequences hardly foreseen by the actors themselves. Sometimes the available legal concepts overlap, and refined distinctions become necessary in order to pin an accurate description on the transaction. * * *"

basis for us to affirm the judgment on the ground that a novation was effected. However, we do not rule out the possibility of a novation. Further proceedings should be had on that point. Moreover, the reversal of the judgment against State Tile opens up the question of HC&D's rights against Terrace. Though Terrace did not appeal and was satisfied with the judgment against it, reversal of the judgment against State Tile changes the situation since Terrace will be aggrieved if it has to pay twice. A conclusion that there was no novation, and the consequent invalidity of the July 11, 1960 agreement as against State Tile, would require that Terrace be protected against having to pay twice, subject, however, to the outcome of HC&D's contentions concerning the payments made by Terrace to Acme in July, 1960. Possibly, additional evidence should be received on this and other points.

We have noted the informal manner in which the issue raised by State Tile was injected without pleading. While we nevertheless have considered the matter because of the absence of objection to such informality, that does not signify that the same informality should be indulged in upon the remand of the case. And of course, upon adherence to the rules of pleading on the part of the intervener, amended or other pleadings on the part of other parties may ensue.

Reversed and remanded for further proceedings, including determination whether amended or other pleadings shall be filed, and whether additional evidence shall be received.

*Robert M. Rothwell* (*Hoddick, Rothwell & Chang* of counsel) for intervener-appellant.

*Burnham A. Greeley* (*Robertson, Castle & Anthony* of counsel) for plaintiff-appellee.

*Kinji Kanazawa* appeared for defendant-appellee on plaintiff-appellee's motion to dismiss. *Gordon C. C. Ho* (*Mau & Ho* of counsel) appeared for defendant-appellee on the hearing on the merits but did not argue.