**TELEPROMPTER OF ERIE, INC.,**
a corporation

v.

**The CITY OF ERIE, a municipal corporation, and its elected officials, officers and agents, the Council of the City of Erie, a legislative body, Larry D. Meredith, President of the Council of the City of Erie in his representative capacity and as an individual, Erie Telecommunications, Inc., a corporation, and Greater Erie Economic Development Corporation, a corporation.**

Civ. A. No. 81–17 ERIE.

United States District Court,
W.D. Pennsylvania.

July 13, 1983.

---

**1280**

William Burke, Erie, Pa., Gregory Harvey, Michael R. Lastowski, Philadelphia, Pa., for plaintiff.

Harold Schmidt, Pittsburgh, Pa., John Quinn, Jr., Erie, Pa., for defendant ETI.

J. David Ungerman, Stephen H. Hutzelman, Erie, Pa., for defendant Larry Meredith.

Thomas Ridge, Erie, Pa., for defendant GEEDC.

John R. Wingerter, Erie, Pa., for defendant City of Erie.

OPINION

WEBER, District Judge.

This lawsuit arises out of the award of a cable television franchise in Erie, Pennsylvania. The plaintiff Teleprompter of Erie is a Pennsylvania corporation that unsuccessfully competed for the cable franchise and thereafter brought this action against the City of Erie, the City Council of the City of Erie, City Council President Larry Meredith, The Greater Erie Economic Development Corporation, and the successful bidder, Erie Telecommunications, Inc. (hereinafter "ETI"). The Erie City Council (hereinafter "Council") manifested its intention to procure a cable communication system destined to return substantial revenue to the city coffer by passing the Erie Cable Communications Franchise Agreement Ordinance on May 7, 1980.[1] The franchise was ultimately awarded on October 29, 1980. It is the process employed in making the award, as well as more particularized allegations of impropriety, that gives rise to this civil rights action. The defendants have moved for summary judgment with respect to all counts of plaintiff's complaint. The plaintiff has filed a cross-motion for partial summary judgment.

I. Factual Background

Pursuant to the Cable Franchise Ordinance, the City Clerk of the City of Erie issued to interested parties a Request for Proposals for the purpose of soliciting bids for the design and installation of a cable television system. The City of Erie opened the registered applicants' sealed envelopes on June 16, and in August 1980 public hearings were held at which each of six applicants made a formal and public presentation of their proposals. The City Council adopted a resolution on August 13, 1980, which set the date of August 25, 1980, as the deadline beyond which no further information from applicants would be accepted.

On September 10, 1980, Erie Comcast was selected as the successful bidder for the cable television franchise and negotiations with Comcast commenced thereafter. An inconsistency between statements which

---

1. At all relevant times the City Council was comprised of the following members; Larry D. Meredith, President; Mario Bagnoni; Patrick Cappabianca; Walter Crishock; Bernard Harkins; Robert Glowacki; Joseph Walczak.

had been made by Comcast in its application for an Urban Development Action Grant and statements made by Comcast representatives relating to the financial ability of the company to construct a cable television system prompted Council to discontinue its negotiations with Comcast. Although the City Council was empowered to reject all remaining applications theretofore accepted, it did not do so. On October 8, Council, by resolution selected ETI as the successful applicant with whom it would negotiate.

On October 15, 1980, because of some confusion with the balloting procedure used previously, Council rescinded the resolution that selected ETI as the successful applicant. On October 22, 1980, ETI and the plaintiff Teleprompter were selected as successful bidders. On October 28, meetings were held between the City Council and representatives of both Teleprompter and ETI. On October 29, 1980, the City Council by a 4–3 vote selected ETI as the successful bidder and awarded it the cable television franchise. A cable franchise agreement was eventually executed between the City of Erie and ETI on November 11, 1980.

A distinct, collateral, yet related set of facts relevant to this lawsuit took place over the course of the City Council's consideration of the proposed bids. In July of 1980, Messrs. Rush, Wiley, and Roy, Officers and Directors of the Greater Erie Community Action Corporation (hereinafter "GECAC") met with Erie Mayor Louis Tullio to discuss the potential for a testimonial in honor of City Council President, Larry Meredith.[2] Councilman Meredith later joined the four men at the meeting and consented to the idea of a testimonial. The affair was subsequently held at the home of Mayor Tullio on October 29, 1980.

The complaint, filed on January 22, 1981, was originally presented in four counts.

Plaintiff alleges that the City of Erie and the City Council awarded the cable communications system contract in a discriminatory, arbitrary, and unlawful manner in violation of its constitutional rights to due process and equal protection of the laws as guaranteed by the Fourteenth Amendment (Count I). Plaintiff charges that ETI, GEEDC, and Meredith deliberately conspired in a scheme of bribery to award the cable contract to ETI in further violation of plaintiff's constitutional rights (Count II). The district court dismissed alleged violations of RICO (18 U.S.C. § 1961 et seq.) (Count III) by reason of plaintiff's failure to allege a series of unlawful acts needed to sustain a cause of action under the "pattern of racketeering activity" requirements of RICO. *Teleprompter of Erie, Inc. v. City of Erie,* 537 F.Supp. 6, 12–13 (W.D.Pa.1981). Finally, plaintiff alleges various pendant state claims. (Count IV).

On February 25, 1982, the defendant ETI filed its motion seeking summary judgment as to the remaining Counts I, II, and IV of plaintiff's complaint. Defendant's motion has been adopted by the remaining defendants. Defendants, the City of Erie, the City Council of the City of Erie, and GEEDC filed similar motions on February 26 and March 11, 1980. The defendant Larry Meredith, in his motion for summary judgment filed on March 17, 1982, specifically references the motion filed on behalf of ETI and adopts the arguments contained therein as his own.

Accordingly, we will more fully address the challenges to plaintiff's complaint raised by the defendant ETI. In addition to its claim for summary judgment, defendant ETI asserts two affirmative defenses, and a blanket challenge to the substantive basis of plaintiff's summary judgment claims on the basis of the court's order of December 24, 1981, by which certain Requests for Admission were granted.

---

**2.** The Greater Erie Economic Development Corporation, (hereinafter "GEEDC") a 10% shareholder in ETI, received as a matter of course a portion of its funding from GECAC. This funding consisted of cash grants of at least $200,000 from early 1975 through April 1976, a cash grant of $150,000 in about September 1978 and a cash grant of $150,000 in about February 1980.

Certain of defendants' earlier challenges have reappeared and apply to both Counts I and II. The defendants intimate that plaintiff has failed to demonstrate a sufficient entitlement or expectation of entitlement to give it a property right under the due process clause of the United States Constitution. We find this argument a hybrid of sorts which blends a previously resolved question of the requisite property interest considered by the prior opinion of the district court and the standing issue raised here for the first time. We will resolve these converging issues in due course.

On March 8, 1982, this court ordered plaintiff to file a consolidated response to defendants' motion. The plaintiff filed various responses on April 5, 1982, along with its cross-motion for partial summary judgment.

The issues have been fully briefed by the parties and are ripe for the court's consideration. The inquiry begins with a review of the affirmative defenses since our ruling on these could obviate the need to proceed with an analysis of all or part of the substantive claims.

## II.

### (1) The Defense of Estoppel.

It has been said that one who is silent when he ought to speak will not be heard to speak when he ought to be silent. *Morgan v. Chicago & A.R. Co.,* 96 U.S. 716, 720, 24 L.Ed. 743 (1877).

Defendants challenge plaintiff's claims under Count I and Count IV, those counts alleging the illegality of the selection process utilized by the City in awarding its CATV franchise, on the grounds that plaintiff must now be estopped from challenging a process to which it had been a willing participant.

The defendants adhere to the doctrine of quasi-estoppel which is regarded as a species of equitable estoppel. The purpose of the doctrine is to forbid one to speak against his own "act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon." 28 Am.Jur.2d *Estoppel and Waiver* § 27 (1966). To claim the benefit of the bar it must be demonstrated that the party to be estopped 1) by word or deed, concealed or misrepresented material facts; 2) with an intent that such conduct be acted upon; and 3) that such conduct was engaged in with actual or constructive knowledge of the real facts. The estoppel defense may be sustained where a party, with sufficient notice and means of knowledge, remains inactive, acquiesces, or otherwise abstains from impeaching a contract or challenging a transaction. 28 Am.Jur.2d § 57. Again, there can be no acquiescence where there is no knowledge, the acquiescence must have been with actual or constructive knowledge of the facts.

We consider first whether in the context of this case, the alleged prior inconsistent position taken by plaintiff was with full knowledge of the material facts. Our essential inquiry is what plaintiff knew and when it knew it.

Council passed a series of resolutions on May 7, 14, and 28, 1980, to facilitate the submission of bids by prospective applicants. The selection of Comcast as the successful bidder was made on September 10, 1980. Thereafter, Council began negotiations and it was discovered that certain inconsistencies existed in the statements made by Comcast's representatives. Plaintiff had no notice of any impropriety in the selection process up to this point in time since the selection and subsequent rejection of Comcast was not the result of any individualized negotiations. The rejection of the Comcast bid and the joint selection of Teleprompter and Erie Telecommunications as successful bidders occurred on October 22, 1980. As of this date plaintiff was without notice that further efforts to "negotiate" a cable franchise agreement would be inconsistent with the concept of competitive bidding.

Defendants argue that at earlier stages in the selection process plaintiff lodged various objections and at other times acquiesced in the negotiations to secure for itself advantages from that process. As an initial matter, we find no inconsistency in plaintiff's current and former position respecting the three events discussed by the defendant ETI. In the first, Teleprompter urged that the original deadline set for the submission of proposals be extended in the interest of allowing the cable companies to present adequate proposals. The extension was adopted and applied equally to all bidders. Second, in a letter dated August 6, a representative of Teleprompter objected to the Council's tardy consideration of materials proffered by Stohrer Cable Communications and Great Lakes Telecommunications. On August 13, the City Council rejected the material of Stohrer and Great Lakes. Third, on October 8, 1980, plaintiff objected to the selection of the defendant Erie Telecommunications as the successful bidder on the grounds that the tabulation of the vote of the Erie City Council was erroneous. We find nothing in these prior acts to sustain defendant's arguments that the plaintiff is estopped in its present claims. Plaintiff's efforts to this point were aimed at preserving the integrity of the selection process as it proceeded. This is not inconsistent with its later legal position challenging the negotiation once they allegedly ran afoul.

In addition, we do not find plaintiff's participation prior to October 22, 1980, in a procedure which anticipated future negotiations to be fatal to its present claim. We find evidence that "negotiations" as referred to by counsel was the process by which council intended to finalize details with a contracting party once that party had been selected from among the pool of applicants. The complexity of the contract subject matter lends credence to such an interpretation. We do not find the concept of individualized negotiations, or the willingness to participate in a process which anticipated them, immediately suspect where the competition among applicants insures equal treatment and where the negotiations take place only after the selection of the most responsible bid. This is a matter to which we shall return.

Any knowledge attributable to plaintiff concerning possible irregularities in the bidding process must arise in the context of the negotiations subsequently carried out with Teleprompter and ETI after notice of their joint selection as successful bidders on October 22, 1980. After this selection, the City Council scheduled private meetings with both parties for October 28, 1980, and a day later ETI was selected as the successful bidder and awarded the cable television franchise. Initially, we find the lapse of time between the date setting negotiations, October 22, 1980, and the date on which ETI was selected as the successful bidder insufficient to have made it incumbent upon the plaintiff to have objected to the fairness of the process employed during the final pre-selection period.[3]

Second, and more importantly, Article IV of the Request for Proposals compelled plaintiff's participation at the October 28, 1980 negotiation session under the threat of rejection of its bid. The negotiations became tainted, if at all, at a crucial stage in the protracted selection process and at a time when it appeared that a decision was at hand and when a challenge to the process would likely have prejudiced the plaintiff. We also note that certain reservations about the propriety of the final day of negotiations were actually communicated by the plaintiff's lawyers to representatives

**3.** Plaintiff alleges that it was not permitted to make changes in its system design, it did however increase the level of prepayments to the City to $2,510,000 and $2,210,000 under two options described as "B" and "C" respectively. Plaintiff alleges that ETI, on the other hand, was both allowed to modify its system design and increase prepayments to $3,000,000 from $1,900,000 if it could build the system proposed by the plaintiff. *Plaintiff's brief,* p. 31.

of the City negotiating team.[4] The circumstances surrounding the final day of negotiations sufficiently militate against plaintiff's obligation to object to the negotiation process employed.

We find this holding consistent with the court's reasoning in *KTVB, Inc. v. Boise City*, 94 Idaho 279, 486 P.2d 992 (1971), relied upon by the defendant. The court in *KTVB, Inc.* while upholding the estoppel bar under the facts before it, noted a distinction between participation and the intimation of full approval. The court stated:

> While appellants may not have been required to forego bidding on the franchise in order to raise the objections to the franchise that they now make, it is clear from *Godoy* [*v. Hawaii*, 44 Hawaii 312, 354 P.2d 78 (1960)] that they at least were required to make some objection to the various deficiencies which they now claim existed in the bidding and granting processes, rather than to intimate full approval by their acquiescent conduct while harboring serious reservations about the process.

In the context of this case, plaintiff's objection would have required it to forego bidding on the franchise and otherwise abandon a process to which it had devoted considerable time and expense. We find the period of participation in allegedly tainted pre-selection negotiations insufficient to have made it incumbent upon plaintiff to challenge the process.

4. City Solicitor Rogala in his final presentation to council actually indicated that members should consider the possibility of a lawsuit being brought on the part of the plaintiff, and this statement was based upon discussions previously held with plaintiff's lawyers.

5. The crux of plaintiff's allegation of post-selection improprieties in the negotiations relate to the allowance provided ETI to change the general rate structure to be charged subscribers. This ability to change the rate structure, according to Teleprompter, allowed ETI an unfair opportunity to provide more revenue to the City. The allotted changes were as follows:

As for the individual negotiations between the successful bidder ETI and the City occurring after October 29, 1980, we find that the plaintiff is now estopped from raising alleged constitutional violations for defendants' conduct during this period.[5] As previously stated, the selection process employed by the City anticipated private negotiations with a successful bidder toward the culmination of the Cable franchise agreement. Plaintiff was made aware at various stages of the process that this would be the procedure. The plaintiff failed to object to the practice when Comcast was selected or at any other time when it was well aware that continued negotiations would be the reward of the successful bidder.

Accordingly, a portion of plaintiff's current action, that challenging the propriety of post-selection negotiations, is barred by the doctrine of quasi-estoppel.

## (2) *The Issue of Standing.*[6]

The Defendants further contend that plaintiff lacks standing to assert the claims presented. The defendants rely on two arguments. First, the plaintiff lacks standing to assert the claims set forth in Counts I, II, and IV, because it was not a properly constituted corporation capable of submitting a valid proposal. Second, the plaintiff lacks standing to assert the claims presented because it was not a taxpayer of the City of Erie.

| | | 8/25/80 Proposal | 11/11/80 Contract |
|---|---|---|---|
| Tier I | Basic Service (12 channel option) | No charge | No charge |
| Tier II | Basic Service (24 channel option) | $5.25/month | $6.75/month |
| Tier III | Expanded Service (70 channel option) | $7.25/month | $8.00/month |
| Tier IV | Custom Network Service | $9.95/month | $12.95/month |

6. Vital considerations involved in this issue are subsumed in the question of whether or not the plaintiff has demonstrated a sufficient liberty or property interest. Plaintiff's property interest in the instant case was found previously in *Teleprompter of Erie*, 537 F.Supp. 6; and is subject only to the abbreviated discussion of

■ With respect to the defendant's first challenge ETI does not dispute that plaintiff's Certificate of Incorporation was issued on November 7, 1979, and that the plaintiff was a duly incorporated Pennsylvania corporation. Defendant, however, questions plaintiff's capacity to transact business in the absence of the installation of corporate officers. It is not disputed that at the time it submitted its bid plaintiff had yet to select corporate officers.

We turn first to Section 207 of the Pennsylvania Business Corporation Law, 15 P.S. § 1207, which states:

> Effect of filing of articles of incorporation.
>
> Upon the filing of the articles of incorporation by the Department of State, *the corporate existence shall begin,* and those persons who subscribed for shares prior to the filing of the articles of incorporation, or their assignees, shall be shareholders in the corporation. (emphasis added). Act of May 5, 1933, P.L. 364. Art. II, § 207, as amended. Supp.1983).

The wording of section 207 makes it clear that the plaintiff was a bona fide Pennsylvania corporation as of November 7, 1979.

In *Wagner v. Wagner,* 466 Pa. 532, 353 A.2d 819 (1976), the Pennsylvania Supreme Court considered the ability of a corporation to conduct business prior to the first meeting of directors. Section 1210 of Title 15 of the Pennsylvania Code mandates that an "Organization" meeting be held to facilitate, among other things, the election of officers.[7] The Court in *Wagner* refused to set aside the acceptance of a conveyance by the corporation prior to its Organization meeting. By so finding, the court gave legal effect to a conveyance that antedated the statutorily required meeting and thereby acknowledged the capacity of a corporation to conduct business before the selection of officers. 466 Pa. at 542, 353 A.2d at 824. Defendant provides no other authority for the proposition that a duly incorporated entity cannot conduct business without the appointment of officers.

■ We find defendants' challenge to the plaintiff's standing deficient in another respect. Defendants, in essence, argue that plaintiff's failure to elect officers vitiates the validity of its bid. We find nothing of record, however, which demonstrates that council would have balked at accepting plaintiff's bid, were it so inclined, on the basis of the failure to elect officers. One of the factors to be considered in questions of standing is whether the party asserting it falls within the relevant zone of interest or otherwise has a present interest which has been impaired. *See, e.g. Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), *Americans United for Separation of Church and State, Inc. v. HEW,* 619 F.2d 252 (3d Cir.1980). The doctrine of standing is a prudential limitation on the capacity of a party to assert a claim on our courts. It should not be so construed as to deny a right to those who have alleged a proximate injury solely on the basis of a failure to satisfy a corporate formality. At all relevant times, the plaintiff stood as a ready and willing supplier of cable services to the City of Erie. On October 22, 1980, it was selected along with defendant ETI as a successful bidder by the Erie City Council. Plaintiff had, in fact, elected officers on October 1, 1980. This was prior to its selec-

---

plaintiff's protected interest appearing later in this opinion.

**7.** Section 210 of the Business Corporation Law, Act of May 5, 1933, P.L. 364, Art. II, § 210, as amended, 15 P.S. § 1210 provides:
Organization meeting.
 After the filing of the articles of incorporation, an organization meeting of the board of directors named in the articles shall be held, either within or without this Commonwealth, at the call of a majority of the directors, for the purpose of adopting by-laws, which they shall have authority to do at such meeting, of electing officers, and of transacting such other business as may come before the meeting. The directors calling the meeting shall give at least five days' written notice to each director, named in the articles, of the time and place of the meeting.

tion, along with ETI, as a successful bidder. The City of Erie at all times demonstrated a willingness to deal with the plaintiff and to grant it a cable franchise. We find these facts sufficient to demonstrate plaintiff's valid interest in the outcome of the claims it now asserts and defendant's challenge to plaintiff's complaint based on standing will be rejected.

■ The defendants also contend that the plaintiff lacks standing because it is not a Pennsylvania taxpayer. Initially, as to Counts I and II, we do not find plaintiff's status as a state taxpayer determinative of its standing to raise claims arising under the United States Constitution. *See generally, Americans United for Separation of Church and State, Inc. v. HEW,* 619 F.2d at 254–66. In their brief the City defendants rely upon *J.P. Mascaro & Sons, Inc. v. Bristol,* 497 F.Supp. 625 (E.D.Pa.1980), for the proposition that a disappointed bidder cannot pursue a Civil Rights claim based on alleged improper bidding procedures. This argument improvidently blends a challenge based on standing with one for failure to state a claim. The City defendants, in pursuance of this line, speak invariably of plaintiff's insufficient protected interest. The court more fully addresses this issue in the context of its discussion of due process. (See succeeding discussion and prior opinion concerning plaintiff's property interest).

■ The defendants also challenge plaintiff's standing to raise the state law claims contained in Count IV.[8] It has been generally accepted that Pennsylvania law requires that an unsuccessful bidder who seeks recourse from an alleged governmen-

tal violation of a bidding process be a state taxpayer. *Perseo v. Commonwealth of Pennsylvania, Department of Transportation,* 63 Pa.Cmwlth. 562, 439 A.2d 1271 (1981), *Price v. Philadelphia Parking Authority,* 422 Pa. 317, 221 A.2d 138 (1966); *R.S. Noonan, Inc. v. York School District,* 400 Pa. 391, 162 A.2d 623 (1960); *Heilig Bros. v. Kohler,* 366 Pa. 72, 76 A.2d 613 (1950). The plaintiff Teleprompter concedes that it is not a taxpayer of the City of Erie. (Plaintiff's response to Defendant ETI's Request for Admissions, number 1–5).[9] The requirement of state taxpayer status insures a legal remedy exclusively for actions "instituted by taxpayers for the protection of taxpayers rights." *Noonan,* 400 Pa. at 395, 162 A.2d 623. Such a requirement vests custodial privileges in those who support the public fisc and suggests a public policy designed to insure accountability. In considering plaintiff's state law claims we are bound by applicable state law. Accordingly, we will dismiss the remaining state law claims contained in Count IV for plaintiff's failure to satisfy the standing requirement of a state taxpayer.

*(3) Plaintiff's Admissions.*

■ Pursuant to Rule 36 [10], plaintiff was deemed to have admitted because of its delinquency in response a variety of matters bearing directly on the claims it now wishes to have considered. It subsequently filed a response to the requests. This court stated in its order granting defendants' Request for Admissions:

... Because the effect of deeming these matters admitted is possibly conclusive of all the issues of a lawsuit, Rule

---

**8.** Plaintiff alleges violations of 53 P.S. §§ 36901 and 36917, and Article XII, § 1–1201 of Pennsylvania's Home Rule Charter and Optional Plan Law, 53 P.S. § 1–1201.

**9.** In its original state court action, the plaintiff Teleprompter filed suit along with O. Ray Crumbly, a plaintiff taxpayer.

**10.** Rule 36(a) provides, in part:
Each matter of which an admission is requested shall be separately set forth. The matter is

admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by his attorney...
Fed.R.Civ.P. 36.

36(b) provides that while matters admitted are deemed conclusively established, a court may permit amendment or withdrawal of an admission when the presentation of the merits of an action will be subserved thereby. The considerations governing the application of this Rule are discussed in 4A Moore's Federal Practice, 36.08. Some courts have held that while an admission under Rule 36 is ordinarily conclusive, it will not be binding agreement against the party charged. It is admissible in evidence, but the party may have an opportunity to contest it with contrary evidence at trial. This may be determined in the final pretrial order in this case. ORDER OF COURT. December 24, 1981.

The plaintiff seeks to have this court set aside the admissions. The test, as enunciated in Rule 36(b), for the withdrawal or amendment of admission is whether (a) upholding the admissions would eliminate any presentation of the merits. *Westmoreland v. Triumph Motorcycle Corp.,* 71 F.R.D. 192 (D.Conn.1976); and (b) if the party opposing the motion has met its burden of showing prejudice. *id., United States v. Cannon,* 363 F.Supp. 1045 (D.Del.1973); 4A Moore, Moore's Federal Practice ¶ 3608 at 3671, n. 9 (2d ed. 1982). While a failure to respond permits this court to enter summary judgment, it is not required to do so where the opposing party has not been prejudiced. *Moosman v. Joseph P. Blitz, Inc.,* 358 F.2d 686 (2d Cir.1966).

■ The subject matter of the admissions is broad and far reaching and satisfies the first requirement. Admission of the facts at issue would effectively preclude plaintiff from proceeding with its claim. The test of prejudice has been held to turn on whether a party opposing the withdrawal is rendered less able to prove the matters which had been admitted. We do not find that the defendant is so prejudiced by allowing the plaintiff to withdraw its admissions in favor of its later responses. Given the tentative nature of the court's order of December 24, 1981, and in accordance with the foregoing we will allow the withdrawal of plaintiff's original admissions.

## COUNT I

Plaintiff alleges in Count I of the complaint that the City of Erie and the City Council violated its constitutional rights to due process and equal protection in the award of the cable franchise. First, plaintiff contends that ETI was not the best responsible bidder and any award made on the basis of its bid was in violation of the due process clause of the 14th Amendment. Second, in its equal protection claim, the plaintiff alleges that its rights were violated because the defendant ETI was permitted to amend its proposal and was availed other bargaining accommodations not provided the plaintiff.

The defendants seek summary judgment as to all of Count I. Plaintiff cross moves for summary judgment on the due process claim, and contends that summary judgment as to the equal protection component of Count I is precluded by the existence of material issues of fact.

### A. Plaintiff's Due Process Claim.

■ The Fourteenth Amendment requires that in order to make out a claim for a denial of procedural due process the plaintiff must demonstrate the deprivation of a protected liberty or property interest. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). The court considered plaintiff's protected interest at the dismissal stage and found that it had "sufficiently alleged a property interest in the award of the Contract." *Teleprompter of Erie, Inc. v. City of Erie,* 537 F.Supp. 6, 11 (W.D.Pa. 1981, Knox J.). In the context of cable franchise awards courts have fashioned a narrow protected interest. It is the right of the most responsible bidder in full compliance with the specifications of state and municipal law to be awarded the cable fran-

chise. *Three Rivers Cablevision v. City of Pittsburgh,* 502 F.Supp. 1118 (W.D.Pa.1980). Once it has been determined that plaintiff has the requisite interest, the question becomes one of how much process is due. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), *Zurak v. Regan,* 550 F.2d 86, 93 (2d Cir.1977); *Wilkinson v. Abrams,* 627 F.2d 650 (3d Cir.1980). Fundamental fairness has generally been regarded as a prerequisite to adequate due process. *U.S. ex rel Meers v. Wilkins,* 326 F.2d 135 (2d Cir.1964); *Burgess v. Miller,* 492 F.Supp. 1284 (D.C.Fla.1980); *Rudisill v. Flynn,* 470 F.Supp. 1269 (D.C.Ill.1979), *aff'd* 619 F.2d 692 (7th Cir.1980). In the context of an award of a cable franchise, it has been held that the process due the plaintiff was the non-arbitrary exercise by the municipality of its decision in making the award. As in *Three Rivers,* the denial here of the substantive benefit without the process due is an actionable wrong.

Looking to plaintiff's protected interest, the court's prior determination will be sustained in the face of a variety of veiled challenges to the sufficiency of that protected interest. However, in light of recent state decisions that arguably vitiate a portion of the court's basis in finding a protected interest, we will reexamine briefly the continuing vitality of plaintiff's property interest.

 The court based its finding on various municipal resolutions and other statutes which were to have guided the Erie City Council in its award of the cable franchise. The court relied upon the Third Class City Code, 53 P.S. §§ 36901(b) and 36917; the Cable Communications Franchise Agreement Ordinance; and the Requests for Proposals. The court determined that the fore-going provisions made it incumbent upon the defendants to award the franchise in a non-arbitrary fashion to the best bidder and, in so requiring, vested a property interest in the prospective award in the plaintiff. We find this holding consistent with prevailing authority that a due process interest in benefits sought to be obtained may arise out of the provisions regulating their disbursement, *see e.g. Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Winsett v. McGinnis,* 617 F.2d 996 (3d Cir.1980).[11]

The defendants now argue that section 36901 of the Third Class City Code does not require an award to the best responsible bidder. This section provided, at the time this action arose, the following:

> ... All services and personal properties required by any city ... where the amount exceeds the sum of two thousand five hundred dollars, shall be furnished and performed under written contract, and the contract shall be awarded and given to the lowest responsible bidder ...[12]

The Pennsylvania Supreme Court in *Lasday v. Allegheny County,* 499 Pa. 434, 453 A.2d 949 (1982) (Roberts, J.) considered an analogous statute, 16 P.S. § 5001(a) of the Second Class County Code, and determined that use of the phrase "lowest responsible bidder" makes such provisions "manifestly inapposite" to a case such as this where a municipality is letting a contract for a revenue generating enterprise.

The court, in considering the defendants' motion to dismiss, did not focus upon this language of section 36901 but rather confined itself to an analysis of whether the letting of a cable franchise was a service "required" by the City under the terms of

---

11. In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the court stated:

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimension defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits

and that support claims of entitlement to those benefits. 408 U.S. at 577, 92 S.Ct. at 2709.

12. The provision was amended to increase the threshold amount necessary to invoke the section to $4,000. Act of December 22, 1981, P.L. 530, No. 151, § 1, 53 P.S. § 36901(b).

the section. We conclude that the Supreme Court's holding in *Lasday,* and its analysis of the identical language in section 5001(a) of the Second Class County Code, removes Section 36901 of the Third Class City Code as a basis to find a property interest in the plaintiff.

■ We find alternative grounds to support the court's holding and a sufficient basis to support the claimed denial of a property interest on the part of the plaintiff. The court correctly read 53 P.S. § 36917 as requiring the sale of city personal property to the best responsible bidder. This section combined with the City of Erie Cable Communication Franchise Agreement Ordinance and the Requests for Proposals was sufficient to create a property interest in the plaintiff in the award of the cable franchise. Once the Erie City Council decided to solicit competitive bids in accordance with a Franchise Ordinance and Request for Proposals it was bound to adhere to its prior resolution as well as other statutory mandates and award the franchise in a non-arbitrary manner. While the court in *Lasday v. Allegheny County,* supra, struck down the statutory basis for the bidders entitlement to the contract it nevertheless held that once the governing body had solicited bids in accordance with its earlier formulated Request for Proposals pursuant to a specified set of criteria, it was "obliged to adhere to that procedure throughout the procurement process." *Lasday,* 499 Pa. 434, 453 A.2d at 954.

The Pennsylvania Supreme Court reached a similar holding in *American Totalisator v. Seligman,* 489 Pa. 568, 414 A.2d 1037 (1980), where an unsuccessful bidder on a contract for the supply of equipment and technology to be used for the state lottery challenged the bidding process where a competitor had been permitted unilaterally to clarify its proposal after bids had been opened. The Court, stated that "when competitive bidding is used and the procedures followed emasculate the benefits of such bidding, we believe judicial intervention is proper." Id. 414 A.2d at 1037. Accordingly, the state law provisions recognized by the court to support a property interest in the plaintiff are buttressed by the State Supreme Court requirement of strict adherence to fairness once the competitive bidding process commences.[13]

Turning to plaintiff's due process claim we note that the parties agree that the process required was the non-arbitrary exercise by the City of its discretion in making the award to the best responsible bidder in full compliance with the specifications.

Plaintiff contends that it was the best responsible bidder as of the proposal deadline date of August 25, 1980. As of that date ETI had offered the City $900,000 in franchise prepayments,[14] as against the $1,500,000 offered by the plaintiff Teleprompter. Defendant responds that at the October 28, 1980 negotiating session ETI offered to pay the City $3,000,000 in prepayments, while the plaintiff had offered only to increase its prepayments to $2,510,-000 and $2,210,000, thus making ETI and not the plaintiff the best responsible bidder. While plaintiff acknowledges that ETI offered more money on October 28, it contends that ETI acted in violation of the August 25 proposal deadline and this opportunity to change its system design not given the plaintiff was the reason ETI was able to offer more money.

The parties devote considerable time to a discussion of their respective systems pro-

13. In this respect, *Lasday v. American Totalisater* are consistent with other Pennsylvania cases. *Lutz Appellate Printers, Inc. v. Commonwealth of Pennsylvania,* 485 Pa. 559, 403 A.2d 530 (1979); *Zurenda v. Commonwealth of Pennsylvania,* 46 Pa.Cmwlth. 67, 405 A.2d 1124 (1979).

14. The prepayments offers by the various bidders were particularly significant to the Council members and was expected to provide considerable relief to the City's budget problems. The prepayments came, in addition to a cash payment, as a loan against future revenues gained by cable subscription payments.

posals in an effort to determine who provided the most responsible bid. Such a result stems from a religious reading of *Three Rivers* which held that the best responsible bidder had a protected interest in the award of the franchise. However, the allegations of improprieties in the competitive process involved in this case are distinguishable from the facts in *Three Rivers* where the court was confronted with allegations that the City had arbitrarily ignored the recommendation of subordinate bodies and chosen a clearly deficient system. In this case we are confronted with a more subtle balance of dollars and system designs. In effect, whatever factors were important to the Erie City Council in light of the balance of prepayments and various systems designs define the considerations council would assess in determining who was providing the most responsible bid.[15] Accordingly, any attempt to identify the most responsible bidder is at best a troublesome task in the context of this case. Moreover, if in the course of the selection process Council afforded one party an unfair advantage to the detriment of another in the formulation of the franchise proposals, the designation of having provided the best responsible bid is suspect to that degree of unfairness. Accordingly, we will proceed directly to a consideration of plaintiff's due process claim of arbitrariness in the award process.

The precise determination before the court involves two issues. First, whether the facts are undisputed the defendant ETI was afforded the opportunity to amend its system design to the prejudice of the plaintiff and without a similar opportunity having been provided the plaintiff; and if such allowance was made, second, whether that system change had an effect on the decision of the Erie City Council to award the cable franchise to the defendant ETI.

In accordance with a resolution passed by Council on August 13, 1980, all parties were informed that the date of August 25, 1980 was the deadline for final suggestions and modifications of the proposed franchise agreement and the submission of financial projections for the years 1980 through 1995. The resolution contained the following warning:

> BE IT FURTHER RESOLVED that no further materials from said applicants will be accepted after Monday, August 25, 1980, 4:30 P.M.
>
> Resolution of Council, August 13, 1980.

The measure was adopted by a unanimous vote of Council.

ETI submitted a dual option proposal on October 28, 1980 pursuant to negotiations conducted earlier that day. In Option I it offered to construct a similar system to that proposed by Teleprompter in the latter's August bid. With this option, ETI offered the City $3,000,000 in 1980, comprised of $2,700,000 in prepaid franchise fees and $300,000 in franchising process payments. ETI's option II conformed with its original proposal presented in June 1980. In effect, Option I constituted an entirely new system proposal by ETI although it ironically referenced a system design previously submitted by Teleprompter.

Teleprompter submitted, as evidenced similarly by a letter to the City Solicitor Donald Rogala, on October 28, 1980, a system design that had originally been submitted prior to August 25, 1980. The proposal contained additional options B and C which altered the financial package available under the original option but, in all

---

15. We reject defendant's arguments that as of August 25, 1980, ETI was the best responsible bidder based on what the defendant argues was a superior system design. If a review of the record in the case makes any one thing abundantly clear, it is that the quality of the various system proposals was not the pre-eminent concern of Council. (See defendants' brief, pp. 36–37). We will not supplant our judgment for that of the Erie City Council in determining the best responsible bidder based on a comparison of sophisticated system designs and prepayments. It is, when all is said and done, within the province of the legislative body to consider proposals and select the one package which assures it adequate knowledge of what it's not paying for.

other respects, conformed to the original system proposal made by Teleprompter.

The plaintiff contends that it was restricted in negotiations to a discussion of the financial aspects of its proposal and could not amend or supplement its systems designs as had ETI.

The defendants offer three arguments in response, echoing a common theme that Teleprompter had the same opportunity to amend its systems designs as ETI and that Council's conduct cannot be considered arbitrary. In considering these arguments we note first that there is no suggestion by the defendants that ETI was not provided the opportunity to amend its proposal. Clearly, the record establishes that such an allowance was afforded.

Presumably by way of its first argument, defendant contends that the resolution of October 22, 1980, selecting ETI and Teleprompter as the successful parties with whom Council would negotiate countermanded, sub silentio, Council's resolution of August 13, 1980, setting the deadline of August 25. We find such an interpretation and plaintiff's knowledge of Council's apparent shift in direction to be an inherently factual question which cannot be determined in the context of this case where the term "negotiations" has been accorded a somewhat chameleon definition. Similarly we find the allegation that the Comcast document as the focus of negotiations put plaintiff on notice that system design changes would be expected is itself a factual question and involves the subsidiary issues of whether such knowledge was sufficient to support the inference that the parties were free to amend their systems. As to defendant's allegation that it is entitled to summary judgment because the plaintiff actually amended its own system design, and hence there was no arbitrariness in the process of selection, we find this contention adequately controverted by plaintiff's evidentiary materials. Plaintiff's proposal, as evidenced by its letter of October 28 essentially includes one system proposal and two financial package variations. The fact that plaintiff did not amend its system design is suggested in the transcript of the very meeting of the Erie City Council which resulted in the selection of ETI as the successful bidder. Mr. Rogala the City Solicitor was questioned during his report on the negotiations of October 28:

> ... MR. BAGNONI: ... The other thing is that my concern is that ATI (sic) has now come in with a new complete proposal that no one else was given the same opportunity to. And my concern then is that that's possible grounds for a suit....
>
> ... So—But let me ask you this. ATC (sic) presented a complete (sic) different package. Did Teleprompter do the same thing?
>
> MR. ROGALA: No.
>
> MR. BAGNONI: Well, this is what I'm saying They were given a deadline to submit, now they've changed within five days.
>
> Transcript of Proceedings of City Council meeting held October 29, 1980, at pp. 13–14.

■ We find that the foregoing dialogue, combined with the evidence of the record taken as a whole, demonstrate significant factual issues concerning Teleprompter's alleged submission of alterations to their system design at the October 28 negotiating session.

Our final concern in assessing defendants' challenge to the due process claim is whether the defendant ETI's ability to amend its system design had an effect on Council's decision to select it as the successful applicant. We find abundant evidence that it did. The record is replete with evidence that Council's primary concern in procuring a cable franchise for the City of Erie was the amount of dollars that would be paid the City up-front by the successful company. ETI was able to offer the amount of $3,000,000, a figure theretofore unprecedented in the bidding, because it was able

to base its financial calculations upon the cost of the implementation of a new system design not previously submitted.

Finally, we find the alleged limits placed on Teleprompter by Council's representatives at the negotiating session of October 28 create factual issues which warrant a denial of defendant's motion for summary judgment. Plaintiff offers evidence that the negotiations were restricted only as to Teleprompter by City Solicitor Rogala. Mr. Fischer stated in deposition that the scope of the negotiations scheduled for October 28, 1980, were defined by the oral statements of Mr. Rogala at the initiation of the sessions. Fischer stated, "he wanted us to limit our proposal to the financial matters, because they had gotten beyond that in the morning (with ETI) and into extraneous matters, and he did not want that to occur in the afternoon." Fischer deposition, p. 10.

Mr. Adams, a representative of Teleprompter, also indicated in deposition testimony that in setting the guidelines for the meeting of October 28, Mr. Rogala indicated that the negotiations would be limited to financial matters. Adams deposition, p. 48.

We find this testimony, in light of ETI's system design changes, if believed by the trier of facts, would demonstrate arbitrariness on the part of the City in the award of the cable franchise.

■ Defendant argues that oral pronouncements, such as those attributed to Rogala by Fischer and Adams, cannot be considered the official dictates of Council. Municipal legislative bodies are generally not to be bound by statements of individual members, but only by properly sanctioned Resolutions or Ordinances.[16] We find this sweeping assertion deficient in two respects. First, in the context of municipal law, a city attorney may bind a municipali-

ty to the same extent that any attorney may bind his client. 10 McQuillen Mun. Corp. (3d Ed.) § 29.15. Second, municipal contracts may be made through appropriate committees of the Council providing such committees are duly authorized. If a municipality chooses to be bound by the actions of a committee, it may do so by resolution or ordinance.

On September 10, 1980, the City Council passed a resolution forming a committee to negotiate a cable franchise agreement on behalf of the City. We find this action of Council and the action of the Committee where the latter acted with the approval of the former sufficient to bind Council. We are mindful that the actions of the Committee were reviewed and approved by Council.

In conclusion and in accordance with our decision regarding plaintiff's partial estoppel, we will not consider plaintiff's due process or equal protection claims as they relate to ETI's private negotiations with Council after its selection as the lone successful bidder. We find that the existence of material issues of fact preclude a grant of summary judgment for either party as to the due process component of Count I, and the respective motions of the parties are denied.

■ We now turn to plaintiff's equal protection claim contained in Count I. We note from the outset that in order to prevail on this equal protection claim plaintiff must establish not only that it was actually discriminated against, but also, because plaintiff is not a member of a suspect class, that the alleged discrimination was purposeful or intentional. *Cook v. City of Price, Carbon County,* 566 F.2d 699, 701 (10th Cir. 1977); *Polite v. Diehl,* 507 F.2d 119, 138 (3d Cir.1974); *Burt v. City of New York,* 156 F.2d 791, 792 (2d Cir.1946). Further, we have no doubt that plaintiff may prevail under an equal protection claim if it is able to demonstrate intentional discrimination in the context of the award of a cable fran-

---

16. We note a certain inconsistency in defendant's argument here since it is similar representations made by members of the negotiating committee which defendant relies upon in argu-

ing that Teleprompter was informed that the Comcast document would provide the basis of negotiations between the parties.

chise. The Equal Protection Clause has been held to compel state authorities to deal with similarly situated organizations in an even-handed manner. *Pliscou v. Holtville Unified School Dist.,* 411 F.Supp. 842 (S.D. Cal.1976). Such claims have been held enforceable when they arise in the commercial setting where plaintiff have challenged unequal application of otherwise neutral provisions. *See, Cook v. City of Price, supra; Three Rivers Cablevision v. City of Pittsburgh, supra; Milnot Company v. Arkansas State Board of Health,* 388 F.Supp. 901 (E.D.Ark.1975). We note further that the concepts of equal protection and due process are not mutually exclusive. *Lee v. Habib,* 424 F.2d 891 (D.C.Cir.1970), *Kline v. Vlandis,* 346 F.Supp. 526 (D.C.Conn.1972); nor are they coterminous. *Allied Am. Mutual Fire Ins. Co. v. Commissioner of Motor Vehicles,* 219 Md. 607, 150 A.2d 421 (1959).

We have previously considered the alleged improprieties attending the negotiating session of October 28, 1980, in the context of alleged due process violations and we now conclude that issues of fact do exist that if resolved in favor of the plaintiff would sustain recovery under the Equal Protection Clause. We find a genuine factual dispute as to whether plaintiff's representatives were restricted to a presentation of financial matters at the session held October 28. Accordingly, we find this evidence, the same needed to support plaintiff's due process claim, if believed by the trier of fact, would demonstrate purposeful discrimination on the part of the City of Erie and the Council of the City of Erie in the award of the cable franchise. The motions of the parties for summary judgment with respect to the Equal Protection component of Count I must, therefore, be denied.

### III.

(1) Plaintiff's Equal Protection Claim under 42 U.S.C. § 1983 against defendants Meredith, ETI and GEEDC.

Justice Holmes once remarked that "temptation is not always invitation". *Erie*

*Railroad v. Hilts,* 247 U.S. 97, 101, 38 S.Ct. 435, 436, 62 L.Ed. 1003 (1917). Plaintiff has alleged in Count II of its complaint that the defendants Meredith, ETI and GEEDC engaged in a conspiracy whereby ETI and GEEDC would give Meredith financial benefits in exchange for his favorable vote as a councilman. It is undisputed that on or about July 1980 certain parties affiliated in some capacity with GECAC, who at the time was a fund recipient from GEEDC (a ten percent shareholder in Erie Telecommunications, Inc.), met with Mayor Tullio at the Erie Hilton Hotel to discuss a testimonial for Council President Meredith. Plaintiff alleges that impetus for the purported fund raiser was to influence Meredith's vote in the upcoming award of the cable franchise.[17] Plaintiff asserts that facts surrounding the fund raiser support the inference that Meredith was bribed and that the defendants conspired to procure the support for ETI in the selection process.

Larry Meredith has replied to plaintiff's allegations by asserting that there are no facts which would support plaintiff's allegation that he either conspired to take a bribe or took a bribe to influence the vote of council. The defendant GEEDC asserts that there is no evidence which indicates that any of the officers, directors, employees and/or staff of GEEDC were involved in the organization and promotion of the Meredith testimonial and that participation in the fund raiser was based upon a criteria which was entirely independent of any relationship with GEEDC. The defendants Erie City Council and the City of Erie challenge Count II of plaintiff's complaint on the grounds that the "visceral allegations" against Councilman Meredith do not constitute a civil rights claim against Erie or the Erie City Council.

In considering the issues raised in Count II we note that Meredith endorses the legal arguments presented by ETI and

---

**17.** Plaintiff asserts among its state law claims that the actions of these defendants amounted to a violation of the Pennsylvania statute 53

P.S. § 1–1201, relating to conflicts of interest and disqualification.

essentially leaves the detailed legal analysis to others. (*See* Meredith Reply Brief, p. 2). It is apparent from the facts that Meredith's role in the alleged conspiracy is determinative of plaintiff's Section 1983 cause of action set forth in Count II. This is true both in fact and in law. Factually, there is no basis which can exist for a conspiracy allegation to bribe Meredith into providing a vote during the cable franchise award if Meredith himself was not a participant in the alleged conspiracy. Legally, a cause of action under Section 1983 cannot be sustained against the private parties without Meredith. Purely private action is not cognizable under Section 1983. In order for a private person who acts in his private capacity to be held liable under Section 1983, it is necessary that that person act in concert with a public official who acts "under color of state law". *See, e.g., Black v. Bayer,* 672 F.2d 309 (3d Cir.1982); *Jennings v. Shuman,* 567 F.2d 1213, 1220 (3d Cir. 1977); *Celano v. Celano,* 537 F.Supp. 690 (E.D.Pa.1982); *Raitport v. Provident National Bank,* 451 F.Supp. 522 (E.D.Pa.1978); *Meyer v. Curran,* 397 F.Supp. 512 (E.D.Pa. 1975); *Beaver v. Boro. of Johnsonburg,* 375 F.Supp. 326 (W.D.Pa.1974). Accordingly, the cause of action in Count II under Section 1983 fails as to the City defendants, ETI, and GEEDC if it fails as to Meredith since the actions of Meredith provide the necessary state action.

As Meredith has deferred to the arguments of ETI, we will be guided for purpose of analysis by the arguments raised by ETI and the challenges therein to Count II of plaintiff's complaint.

### A) *Color of State Law.*

Defendant ETI first contends that Meredith's actions were not taken under color of state law. There is no dispute in this case that Councilman Meredith was not authorized by a policy or custom of council to accept a bribe or otherwise to act on his own to violate the plaintiff's civil rights. ETI relies upon *Mosher v. Beirne,* 237

F.Supp. 684 (E.D.Mo.1964), where the court held that where authority is lacking to deprive another of his guaranteed rights then there is no color of law necessary to sustain a civil rights action. 237 F.Supp. at 687.

 We find the defendant's argument meritless. The Civil Rights Act does not exclude from its purview the wrongful acts of an official for which the official has no authority. In *Basisti v. Weir,* 340 F.2d 74 (3d Cir.1965) the court held that a wrongdoer is cloaked with the authority of state law for purposes of Section 1983 when he exercises a power that he possesses by virtue of state law. We will reject defendant ETI's challenge to Count II of Plaintiff's Complaint based on a failure to satisfy the under color of state law requirements of a Section 1983 cause of action.

### B) *The Conspiracy to Bribe Meredith.*

Defendant ETI in support of its motion for summary judgment, asserts that the defendants lacked the ability to violate the plaintiff's civil rights. The defendants' challenge is not unlike a motion to dismiss for failure to state a claim. When treated as such it is apparent that in order for Count II of plaintiff's complaint to fail on the inadequacy of its substantive allegations, the defendants are obliged to demonstrate that under no set of facts could the defendants' joint participation in the conspiracy result in the deprivation of plaintiff's rights. This they cannot do. This court will not inquire of the innumerable circumstances under which a conspiracy or the threat of a conspiracy to bribe a member of a legislative body might in fact dictate the results of votes or negotiations undertaken by that legislative body. This challenge must be rejected.

The more compelling argument is ETI's assertion that the facts are undisputed that no conspiracy existed to bribe Meredith.

The basis for plaintiff's allegation in paragraph 10 of its complaint are more fully set forth in paragraphs 40 through 47

of the complaint. Plaintiff now contends that genuine issues of material fact preclude summary judgment on the equal protection claim set forth in Count II. For the reasons that follow we disagree and will enter summary judgment in favor of the defendants as to Count II.

■■■■ The law of this Circuit and the law of summary judgment generally requires that the party responding to a motion for summary judgment set forth "countervailing evidence establishing a genuine factual dispute." *See, e.g., Scooper Dooper, Inc. v. Kraftro Corp.,* 494 F.2d 840, 848 (3d Cir.1974); *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Perma Research and Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969); *Radio City Music Hall Corp. v. United States,* 135 F.2d 715 (2d Cir.1943). It is also recognized that summary judgment should be granted only where it is clear that there is no genuine dispute about either the facts or the inferences to be drawn from such facts. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). This is particularly critical where intent is a controlling element. *Schmidt v. McKay,* 555 F.2d 30, 37 (2d Cir.1977); *Mutual Fund Investors v. Putnam Management Co.,* 553 F.2d 620, 624 (7th Cir.1977). Accordingly, even though there may be no dispute about the basic facts, still summary judgment will be inappropriate where the parties disagree on the inferences which may reasonably be drawn from those facts. *Winters v. Highlands Ins. Co.,* 569 F.2d 297, 299 (5th Cir. 1978); *Exnicious v. United States,* 563 F.2d 418, 423–24 (10th Cir.1977). And summary judgment is "likely to be inappropriate when issues of motive, intent, and other subjective feelings and reactions are material." 6J Moore, Moore's Federal Practice ¶ 56.17 [41.–1] (2d ed. 1982); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

■■■ Far from creating the inference that Meredith participated in a bribery scheme to secure the cable franchise for ETI, an almost elementary review of the chronology of events surrounding the Meredith testimonial as well as the nature and basis of its origin and promotion, demonstrate clearly that no impropriety was effectuated through the office of Meredith by promoters of ETI or GEEDC.

The initial discussion of the Meredith testimonial occurred on or about July 9, 1980 at the Hilton meeting. The meeting was called to discuss the development of a revolving loan program for the Community Development Block Grant Program and the City Community Service Administration to assist minority contractors. The conversation turned to the subject of Larry Meredith testimonial at the suggestion of Mayor Tullio. Fred Rush's recollection is consistent with that of all the others present. According to Rush the Mayor stated:

> . . . the black community had never really shown their appreciation of him. And he realized that by being on City Council, Larry had probably hurt his law practice from the time that City Council takes out, and he said it would be nice if we had a testimonial for the black community and the white community to really show that they care about Larry. (Rush Deposition, pp. 20–21).

It was agreed that a testimonial would take place at the Mayor's home and that Fred Rush would assist the Mayor in notifying prospective invitees from among the black community. Apparently, this was a common arrangement between Rush and the Mayor when the latter organized social or political affairs. It is undisputed that Mayor Tullio and Rush subsequently organized and planned the testimonial with the Mayor providing for tickets, food, beverages and invitees from among the white community, and Rush acting as a liaison with prominent members of the Erie black community.

The fact that Mayor Tullio and Rush were the prime movers of the event is unrefuted by the plaintiff. However, the plaintiff contends that the testimonial was "or-

ganized and planned by representatives of GEEDC." Mayor Tullio and Fred Rush were both members of GEEDC's Advisory Board of Directors. Plaintiff's argument presumes that in planning the testimonial these men acted with a purpose designed to further the interest of GEEDC. There is no evidence in all the amassed data currently before the court that would support such an inference. There is nothing in the manner of affairs alluded to by the plaintiff which would suggest that it was improper for the Mayor and an Assistant, both advisory members of an organization engaged in community economic development, to contemplate a testimonial for Meredith. We are reminded that plaintiff must at least demonstrate a factual question in order to avoid an award of summary judgment in favor of the defendant. The plaintiff must stand upon more than its allegations.

The plaintiff argues further that "GEEDC representatives" attended the fundraiser and paid money to Meredith. It is true that many of the black guests in attendance were affiliated in some capacity with GEEDC. However, there is no evidence to indicate that their attendance was prompted by this affiliation or a desire to influence Meredith in his capacity as Council President. Moreover, we do not find it unusual that in a city the size of Erie many of the prominent individuals invited from among the black community might also have some affiliation with an organization involved in the ongoing work of economic development. Mr. Rush described the process by which he selected prospective invitees:

A. I sat down and wrote the names out. These would be the same people I would invite if the Mayor said to me, "Next week Andy Young is coming to town and I want twenty black folks on the steps of City Hall." They are people who usually show up. If not show up or contribute to at least make their presence known, in some form or fashion.

Q. And these would be more or less prominent people in the black community?

A. Well I was asking primarily for a hundred dollars worth of contributions apiece, so you can't go to welfare folks, really. (Rush Deposition, p. 25).

An examination of the guest list indicates that GEEDC affiliated individuals, both black and white, contributed $1,450 of the $4,250; that there were perhaps 15 such guests of an approximate total of 31 contributing persons present;[18] that among the 15 GEEDC affiliated persons, six were members of the advisory board with no direct financial stake in the operations of the corporation;[19] three owed their attenuated affiliation with GEEDC to their positions at GECAC or Triangle Tech;[20] and that from the six remaining affiliates a total of $600 was received constituting 14% of the total amount presented to Meredith. The chairman and major stockholder of ETI, J. Robert Baldwin, was present but contributed nothing. A total of $200 was contributed by relatives of Baldwin.

We find little on these facts, standing as they do by themselves, which support the unbuttressed inference that an attempt at bribery was contemplated or affectuated by the testimonial. Moreover, there can be little doubt that Meredith knew the identity of both those who organized and those who were invited to attend the fundraiser but we find little in such knowledge to support

18. Benjamin Wiley, Kenneth Roy, Red Rush, Hon. Louis Tullio, Amos Goodwine, Jr., Vernon Dobbs, Tessie Blanchard, Eva Tucker, Bobby Harrison, Don Cutri, Gary Horton, Johnnie Mae Atkinson, Paul Martin, James Bailey, and James Agras.

19. Kenneth Roy, Fred Rush, Hon. Louis Tullio, Don Cutri, Johnnie Mae Atkinson, and James Bailey.

20. Benjamin Wiley (Executive Director GECAC), Gary Horton (GEGAC) and James Agras (Triangle Tech).

the inference that Meredith acquiesced or actively engaged the alleged effort to influence his vote in the cable franchise award process for monetary gain. Accordingly, there is nothing here to indicate that plaintiff was denied equal protection of the law by virtue of the testimonial.

Finally, plaintiff asserts that Meredith scheduled the council vote of October 29, 1980, to coincide with the date of the testimonial. A comparison of the chronology of events leading to the testimonial with the often rambling course of the cable franchise award process makes it clear that any effort to make use of the testimonial to influence Meredith would have been dependent upon the occurrence of repeated fortuities in the selection process. The initial discussion of the Meredith testimonial occurred on or about July 9, 1980 at the Hilton meeting. This was a full two months prior to the initial deadline set for the receipt of proposals in connection with the cable franchise award. Likewise, it was two months prior to the selection of Erie Comcast as the successful bidder and approximately three months prior to Comcast's eventual disqualification from negotiations because of an apparent discrepancy in its submitted reports which was not discovered until sometime after September 10, 1980. This is a date of some significance since it was on that date that invitations announcing the Meredith dinner for October 29, 1980 were procured from the printer. Accordingly, the decision to schedule the testimonial on October 29, 1980, was made prior to September 10 and prior to the selection and subsequent disqualification of Comcast. Plaintiff maintains that it was possible for Meredith to have scheduled the final vote of council on the cable franchise and the selection of ETI to coincide with the date of the testimonial. We note that the date for the final vote was set only after the defendant ETI had once previously been selected as the successful bidder on October 8, 1980. Not until October 22, 1980, was the defendant ETI again selected along with Teleprompter as a successful bidder. There is no evidence to indicate that Meredith's selection of October 29 was motivated by any desire to correspond the vote on a cable franchise with the testimonial. There is no evidence that the testimonial and the vote on the cable franchise were related in any way. The testimonial was planned and it proceeded as scheduled. The vote on the cable franchise had become unduly protracted and the subject of close public scrutiny. It is predictable that in the face of repeated delays council would seek to calendar the final vote at the earliest time. We take judicial notice that Erie City Council meets on Wednesdays and it is apparent that October 29 provided the earliest date a vote could be taken to choose the bidder after October 22.[21] The fact that the testimonial scheduled months earlier should happen to fall on the date of the final vote by council on the cable franchise, in the context of this case and in the absence of other evidence, is a matter of coincidence that will not support plaintiff's equal protection claim.

In conclusion, we find that the idea of the testimonial originated with Mayor Tullio, presumably for the reason of paying tribute to the Erie City Council's first black member and its first black president. Those invited would be persons who had shown an interest in attending an affair such as this or indicated that they would support Larry Meredith, and that they were people who had the financial means to attend such an affair. The decisions concerning the organ-

---

**21.** Councilman Harkins' comments typify the attitude of Council in October 1980; he stated on October 22:

> ... And I do believe very firmly and confidently that we're rapidly coming to a decision. And by next Wednesday I feel we can pick the company, that we will affix our signatures to a contract.

> \* \* \* \* \* \*

> ... And I hope that we can get a full consensus of the council so that we can get together on this, if possible, unanimously, and pick the company and get the show on the road. Because the people out there are demanding television as quickly as possible on the cable.

ization and promotion of the testimonial originated in July, 1980. The date, time and place for the fund raiser was decided on or before September 10, 1980. The date of October 29, 1980, the date of the testimonial, was selected by the Mayor at a time when it was impossible for any of the parties in this lawsuit to have foreseen that Council would be voting to award the franchise on the same date, or that it would award it to ETI. It is apparent that many of the decisions relevant to the testimonial were made at a time when the Erie City Council was negotiating what it believed to be a final franchise agreement with Comcast.

Wherefore we will dismiss Count II of Plaintiff's complaint as to all defendants.

In accordance with the foregoing, we will confine all future proceedings to a consideration of Count I—the Due Process and Equal Protection claims associated with the negotiating session of October 28, 1980.

An appropriate order will issue.

### ORDER

AND NOW this 13th day of July, 1983, in accordance with the accompanying Opinion, IT IS ORDERED as follows:

(1) Plaintiff's and Defendants' Motions for Summary Judgment are DENIED with respect to the Due Process Claim of Count I and Defendants' Motion for Summary Judgment is DENIED with respect to the Equal Protection Claim of Count I.

(2) Defendants' Motion for Summary Judgment is GRANTED with respect to Count II.

(3) Defendants' Motion for Summary Judgment is GRANTED with respect to Count III.

(4) Plaintiff's Due Process and Equal Protection claims are estopped to the extent that they relate to events occurring after the negotiation and selection sessions of the Erie City Council of October 28 and 29, 1980.

(5) The parties shall be restricted to a consideration of the Due Process and Equal Protection claims of Count I, upon which summary judgment has been denied, only to the extent those claims arise in the context of the events of October 28 and 29, 1980.

(6) In accordance with the court's ruling respecting Counts II and III, complete summary judgment is ENTERED in favor of Defendants Larry D. Meredith in his individual capacity and Greater Erie Economic Development Corporation, and as such the action against them is DISMISSED.